Kenneth **REKANT** on behalf of himself as an individual, etc., Appellant,

v.

Arthur A. **DESSER** et al., Appellees.

No. 25872.

United States Court of Appeals.

Fifth Circuit.

April 20, 1970.

Lawrence Feingold, Miami Beach, Fla., for appellant.

E. David Rosen, Miami, Fla., Moses Krislov, Cleveland, Ohio, Gerald M. Higier, Miami Beach, Fla., for appellees.

Philip A. Loomis, Jr., Gen. Counsel, SEC, Washington, D. C., as amicus curiae.

Before WISDOM and AINSWORTH, Circuit Judges, and JOHNSON, District Judge.

WISDOM, Circuit Judge.

The plaintiff appeals from the district court's dismissal of the complaint for failure to state a private right of action under Sections 10(b) and 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and § 78o(d). We hold

that the plaintiff has a derivative action under Section 10(b) [1] and Rule 10b–5 [2] against the president of a corporation, directors, and co-conspirators who fraudulently caused the corporation to issue to the president and others in league with him treasury shares and a note for grossly inadequate consideration.

\* \* \* \* \* \*

On August 17, 1967, Kenneth Rekant sued Arthur A. Desser, president and a director of World-Wide Realty and Investing Corporation (formerly Lefcourt Realty Corporation) and others for damages resulting from an alleged fraud and deceit upon the corporation and its stockholders.[3] The plaintiff sued (1) derivatively, on behalf of the corporation, (2) individually, and (3) on behalf of all similarly situated shareholders of World-Wide.[4] In the original complaint Rekant charged Desser and the directors with "fraudulent mismanagement" of the corporation and described the other defendants as "co-conspirators". The complaint is based on two transactions —one involving the Henry Hudson Hotel in New York City and the other involving Desser's River Oaks Farm in Montgomery County, Maryland.

In November 1965, in its annual report for the fiscal year ending April 20, 1965, World-Wide included a letter to the stockholders from Desser containing the following statement regarding the corporation's contract to purchase the Henry Hudson Hotel:

Recently, we contracted to purchase the 1000 room Henry Hudson Hotel on West 57th and 58th Streets across from the New York Coliseum and close to the new Lincoln Center. The purchase was made at very favorable terms which includes the Seller subordinating its second mortgage (not yet committed) which would include a $2,000,000 fund for renovation and modernization. Our engineers are presently working on plans for this

1. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—\* \* \*

 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

 § 10(b), 15 U.S.C. § 78j Manipulative and Deceptive Devices.

2. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

 (a) to employ any device, scheme, or artifice to defraud,

 (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

 (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

 17 C.F.R. § 240.10b–5: Employment of Manipulative and Deceptive Devices.

3. The defendants are Arthur A. Desser, Dennis D. Carlin, Norman A. Eliot, Benjamin M. Millard, James E. Smith, George Levin, Michael Greenberg, all directors in World-Wide, World-Wide Co. & L. Inc., a New York corporation, Joseph Goumont, Henry Hudson Hotel Corporation, a New York corporation, Fred Phillips, Edward C. Sterling, Linda Rhyne Desser, Greenbreak, Inc., a Maryland corporation, Judith Siderman, as Executrix of the Estate of Bernard Siderman, Deceased, Sheldon R. Caplow, Alan M. Kornbluh, Vance Foster, Judith Siderman, Dorothy Bailey, and World-Wide Realty and Investing Corporation, a Delaware corporation.

4. The representative action described two classes: (1) persons who now hold stock in the Company and (2) persons who bought any shares of stock after April 13, 1959, the date on which Rekant purchased the six shares which constitute his present holdings in the Company.

modernizing program and we are hopeful that the hotel will provide the company with large revenues.

The complaint alleges that the corporation assigned the Henry Hudson Hotel contract to Desser and to Joseph Goumont, partners or joint venturers, for a nominal consideration, depriving the stockholders of "the large revenues" promised in the 1965 report. Moreover, so the plaintiff avers, Desser converted even this nominal consideration to his own use.

The 1965 report also included a letter to the stockholders from Desser relating to the River Oaks Farm. This letter states:

For several years, I have owned a 167 acre parcel of land called the River Oaks Farm. Demand for estate homesites in this exclusive suburb of Washington, D. C. has reached the point where subdivision of this property should increase its value. In order to obtain the $5,000,000 financing concluded in May, I had to make this parcel of land available as part of the collateral to secure the indebtedness. Subsequently, I sold this property to the Company for the then market price, giving the Company the opportunity to subdivide it and reap the profits from the sales of homesites and home construction. The portion of the purchase price in excess of the existing encumbrance, $782,674, is represented by an unsecured note payable to me when the Company has

funds available. The note finally matures in 1972. $250,000 was reserved from the $5,000,000 borrowing for land improvements for this parcel and our engineers are presently working on a master plan.

Rekant says that Desser paid $100,000 for the farm, but that it was worth no more than $150,000 at the time World-Wide bought it for $1,100,000. The complaint also alleges:

that the unsecured Note payable to Desser in the amount of $782,674 was continually reduced any time the corporation received any substantial monies, thereby leaving World-Wide with a continuing operating loss and a continuous shortage of working capital; all of which acts were part of a device, scheme and artifice wherein World-Wide and its stockholders were defrauded of substantial benefits that would have been incurred had the property been purchased at market value; or, in the alternative, this $5,000,000.00 financing to which this property was mortgaged was never properly utilized for normal business uses because the effect of the sale of the Montgomery County, Maryland property by Desser to World-Wide was to divert ⅕th of the proceeds of a $5,000,000.00 loan to purchase a farm owned by Desser and valued under $150,000.00.

World-Wide filed no annual report for the period ending April 20, 1966, a violation of § 15(d) [5] and Rule 15d–1.[6]

5. Each issuer which has filed a registration statement containing an undertaking which is or becomes operative under this subsection as in effect prior to August 20, 1964, and each issuer which shall after such date file a registration statement which has become effective pursuant to the Securities Act of 1933, as amended, shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, such supplementary and periodic information, documents, and reports as may be required pursuant to section 78m of this title in respect of a security registered

pursuant to section 78*l* of this title. The duty to file under this subsection shall be automatically suspended if and so long as any issue of securities of such issuer is registered pursuant to section 78*l* of this title. The duty to file under this subsection shall also be automatically suspended as to any fiscal year, other than the fiscal year within which such registration statement became effective if, at the beginning of such fiscal year, the securities of each class to which the registration statement relates are held of record by less than three hundred persons. For the purposes of this subsection, the term "class" shall be construed

This omission apparently was part of the alleged scheme to defraud (at least, it facilitated the scheme): failure to file the 1966 report avoided the necessity of the defendants' disclosing in the annual report what had happened in the Henry Hudson and River Oaks transactions *after* the favorable prospects were set forth in the 1965 report.

In 1959 Rekant paid the total sum of $56.45 for six shares of Lefcourt Realty Corporation (now World-Wide).[7] He still owns these six shares which, he says, are now "practically worthless" as a result of Desser's schemes to defraud the corporation.

The district court dismissed the original complaint, without prejudice, for lack of federal jurisdiction over the subject matter. Rekant then filed an amended complaint alleging that Desser and the other directors had caused World-Wide to issue treasury shares to the "participants" in the Henry Hudson Hotel and River Oaks transactions for no consideration. The defendants sold the stock on the open market shortly after receiving it.[8]

In the district court Rekant strongly emphasized that the failure of Desser and other directors to file the 1966 annual report gave rise to a private cause of action. On appeal he shifted the emphasis to § 10(b) and Rule 10b–5.

The district court gave these reasons for the order of dismissal:

violations of Rule 15–d do not give the plaintiff a private right of action, and furthermore the plaintiff does not have a cause of action under Rule 10 (b) (5) in that internal corporate matters or mishandling of corporate transactions is not within the purview of this Rule. Furthermore, the issuance of World-Wide's treasury stock, as alleged in the Amended Complaint, is not in connection with the purchase or sale of securities so as to give this plaintiff an action under Rule 10(b) (5).

I. *Standing to Sue: The Buyer-Seller Requirement.*

We take up, first, the question whether the plaintiff must be a buyer or seller to have standing to sue.

to include all securities of an issuer which are of substantially similar character and the holders of which enjoy substantially similar rights and privileges. Nothing in this subsection shall apply to securities issued by a foreign government or political subdivision thereof. 15 U.S.C. § 78o (d).

6. Every registrant under the Securities Act of 1933 which is subject to Section 15(d) of the Securities Exchange Act of 1934 shall file an annual report for each fiscal year after the last full fiscal year for which certified financial statements were contained in its registration statement under that Act at the time such statement became effective. The report shall be filed within 120 days after the close of the fiscal year or within such other period as may be specified in the appropriate annual report form. 17 C.F.R. § 240.15d1.

The complaint also alleges that the semi-annual report and certain other required reports were never filed.

The Securities and Exchange Commission, in its amicus brief, states: "In this connection, we note that the public files of the Commission (File No. 0–1956–2)

disclose that, in fact, World-Wide did file its annual report on Form 10–K for fiscal 1966 on June 16, 1967, almost ten months after it was due. That filing was made after the plaintiff allegedly requested by letter dated January 3, 1967, certain information concerning the corporation including information concerning the transactions here at issue (R. 5–6, 8–9). That report makes no reference to any of the alleged fraudulent transactions. The file does not, however, contain any copy of the required annual report to stockholders for that year. Nor were certain other required reports for periods in that year filed with the Commission."

7. It is a disconcerting thought that a shareholder with his tiny holding should have access to as powerful a weapon as § 10 (b). The plaintiff, however, is in a fiduciary relationship to the other shareholders as a consequence of bringing a derivative action and a class action.

8. The amended complaint also alleges that the defendants wrongfully diverted corporate funds to Desser's relatives by paying salaries to the relatives for no services.

■ Rule 10b–5, promulgated under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, makes unlawful the employment of "manipulative and deceptive devices" "in connection with the purchase or sale of securities". Since 1946 courts have construed the rule as providing an implied private right of civil recovery for its violation.[9] Kardon v. National Gypsum Co., E.D.Pa.1946, 69 F.Supp. 512.[10] In recent years, the rule has been applied in such a variety of situations that one can scarcely find an issue of the advance sheets of the Federal Supplement and Federal Reporter that does not contain an opinion on § 10 (b). This extraordinary expansion of subject-matter coverage by § 10(b) and Rule 10b–5, coupled with the possibility of extraordinarily great liability, has moved courts to limit the class of persons who may recover to purchasers or sellers of securities. In the leading case of Birnbaum v. Newport Steel Corp., 2 Cir., 1952, 193 F.2d 461, cert. denied 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356, the court construed the language "in connection with the purchase or sale of any security" as limiting standing to sue to buyers or sellers of securities. *See also* City National Bank of Fort Smith v. Vanderboom, 8 Cir., 1970, 422 F.2d 221.

*Birnbaum* has been shot at by expert marksmen. The buyer-seller require-ment for standing has been criticized as too strict a reading of the rule.[11] Commentators have said that *Birnbaum* has been significantly eroded in a variety of later cases, even in the Second Circuit.[12] *Cf.* Crane Co. v. Westinghouse Air Brake Co., 2 Cir., 1969, 419 F.2d 787. *See also* Kahan v. Rosenstiel, 3 Cir., 1970, 424 F.2d 161 (injunctive relief). Bloody but unbowed, *Birnbaum* still stands. Iroquois Industries, Inc. v. Syracuse China Corp., 2 Cir., 1969, 417 F.2d 963; Greenstein v. Paul, 2 Cir., 1968, 400 F.2d 580. *See also* Vanderboom v. Sexton, 8 Cir., 1970, 422 F.2d 1233.

■ A. *The derivative action.* The amended complaint alleges that World-Wide issued treasury shares to Desser and his alleged co-conspirators for grossly inadequate consideration. The rule in this Circuit and other Circuits is that a corporation issuing its own treasury shares is a seller of securities for purposes of Rule 10b–5. Schoenbaum v. Firstbrook, 2 Cir., 1968, 405 F.2d 215; Pappas v. Moss, D.N.J.1966, 257 F. Supp. 345, 363, reversed on other grounds, 3 Cir., 1968, 393 F.2d 865; Dasho v. Susquehanna Corp., 7 Cir., 1967, 380 F.2d 262; Ruckle v. Roto American Corp., 2 Cir., 1964, 339 F.2d 24; Hooper v. Mountain States Sec. Corp., 5 Cir., 1960, 282 F.2d 195, cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961).

---

9. See the discussion of the theories on which implied liability rests and the authorities collected in Bromberg, Securities Laws: Fraud—SEC Rule 10b–5 (1969); 3 Loss, Securities Regulations at 1763 (1969 ed.); Ruder, Civil Liability under Rule 10b–5: Judicial Revision of Legislative Intent?, 57 Nw.U.L.Rev. 627, 687–690 (1963); Joseph, Civil Liability Under Rule 10b–5-A Reply, 59 Nw.U.L.Rev. 185 (1964); Painter, Inside Information: Growing Pains for the Development of Federal Corporation Law Under Rule 10b–5, 65 Colum.L.Rev. 1361 (1965); Fleischer, "Federal Corporation Law": An Assessment, 78 Harv.L.Rev. 1146 (1965); Klein, The Extension of a Private Remedy to Defrauded Securities Investors Under SEC Rule 10b–5, 20 U. Miami L.Rev. 81 (1965); Comment, The Prospects for Rule X–10b–5: An Emerg-ing Remedy for Defrauded Investors, 59 Yale L.J. 1120 (1950).

10. It all started with Judge Kirkpatrick's conclusion in *Kardon*:
The disregard of the command of a statute is a wrongful act and a tort. * * * "This is but an application of the maxim, Ubi Jus ibi remedium" [Where there is a right, there is a remedy.] * * * [T]he right is so fundamental and so deeply ingrained in the law that where it is not expressly denied the intention to withhold it should appear very clearly and plainly. 69 F.Supp. at 513.

11. Leech, Transactions in Corporate Control, 104 U.Pa.L.Rev. 725 (1965).

12. Lowenfels, The Demise of the Birnbaum Doctrine: A New Era for Rule 10b–5, 54 Va.L.Rev. 268 (1968).

In *Hooper* this Court permitted the trustee in bankruptcy to bring a derivative action alleging that the former officers of a corporation by false representations had induced the transfer agent to issue stock to them for worthless property. Judge Brown, for the Court, held that the issuance of the stock was a "sale", and thus the corporation was a defrauded "seller". For good measure, Judge Brown added: "If this is not a sale in the strict common law traditional sense, it certainly amounted to an arrangement in which [the corporation] 'otherwise disposed of' its stock".[13]

In addition to the treasury sales, another security involved in the River Oaks transaction was World-Wide's note for $782,000 to its president at an allegedly inflated value.

 As used in the Exchange Act, the term "security" "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits". Tcherepnin v. Knight, 1967, 389 U.S. 332, 338, 88 S.Ct. 548, 554, 19 L.Ed.2d 564, 570, *citing* SEC v. W. J. Howey Co., 1946, 328 U.S. 293, 299, 66 S.Ct. 1100, 90 L.Ed. 1244, 1250. Section 3(a) (10) of the Act defines a security as including "any note" except one which "has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof, the maturity of which is likewise limited". Consequently, a security as it is defined in § 10(b) includes "any note", "unless the context otherwise requires".

15 U.S.C. § 78c(a). The Supreme Court has said, "Instruments may be included within any of [the Act's] definitions, as a matter of law, if on their face they answer to the name or description". SEC v. C. M. Joiner Leasing Corp., 1943, 320 U.S. 344, 351, 64 S.Ct. 120, 123, 88 L.Ed. 88, 93; *accord*, Tcherepnin v. Knight, 1967, 389 U.S. 332, 339, 88 S.Ct. 548, 19 L.Ed.2d 564, 571. Reviewing the cases, this Court has commented " * * * [the] definition of a security [in § 3(a) (10)] has been literally read by the judiciary to the extent that almost all notes are held to be securities". [Citations omitted.] Lehigh Valley Trust Co. v. Central National Bank of Jacksonville, 5 Cir., 1969, 409 F.2d 989, 991–992. On the facts alleged, we conclude that the note in the present case is a "security" for purposes of § 10(b) and Rule 10b–5. That World-Wide may have chosen to pay for the land by the issuance of its note as opposed to the issuance of some other form of security should have no bearing on the coverage of the Rule since the Rule prohibits fraud in connection with the sale of *any* security. It has long been recognized that the issuance by a corporation of its securities constitutes a "sale" within the meaning of Rule 10b–5. *See, e. g.*, Hooper v. Mountain States Securities Corporation, *supra*, 282 F.2d at 200–203; Ruckle v. Roto American Corporation, 2 Cir., 1964, 339 F.2d 24; Schoenbaum v. Firstbrook, *supra* (en banc) 405 F.2d 215.

██ Regardless of the individual and representative actions, the complaint supports a derivative action.[14]

---

13. The Court's strenuous effort in *Hooper* to find that issuance of stock is equivalent to a sale suggests that this Circuit respects the buyer-seller requirement for standing to sue, even in a derivative action.

14. See Schoenbaum v. Firstbrook, *supra*, (en banc) 405 F.2d 215, which involved facts similar to those in the instant case and recognized that the entire board of directors can commit fraud on the corporation in violation of Rule 10b–5. *Accord*, Pappas v. Moss, 1968, 3 Cir., 393

F.2d 865; Dasho v. Susquehanna Corporation, 7 Cir., 1967, 380 F.2d 262, certiorari denied, Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967). The court in *Schoenbaum*, 405 F.2d at 219, quoted its previous opinion in Ruckle v. Roto American Corporation, *supra*, 339 F.2d at 29 which pointed out that " * * * in other contexts, such as embezzlement and conflict of interest, a majority or even the entire board of directors may be held to have defrauded their corporation". In *Ruckle*, which in-

B. *The Individual and Class Actions.* Rekant does not contend that he suffered any damages except from the loss in value of his six shares. He did not buy or sell any securities in World-Wide as a result of the defendants' allegedly fraudulent transactions. He alleges that he held onto his stock as a result of the 1965 annual report.

■ The Securities and Exchange Commission contends, as stated in its amicus brief, that "the proper test for whether misrepresentations and omissions of material facts are in connection with the purchase or sale of any security, thus giving rise to a cause of action under Rule 10b–5, is whether they have influenced an investor's judgment to buy, sell or *hold* such security". In this case, we do not reach this contention, for we agree with the Commission: "[The plaintiff] fails to allege that the misrepresentations and omissions of material facts influenced his investment judgment or that of any other stockholder with respect to World-Wide's securities." We hold, therefore, that the complaint does not properly raise the question whether the plaintiff's failure to purchase or sell his stock, as opposed to holding it, is fatal to his individual and representative actions.

II. *Does the complaint state a federal cause of action under the Securities and Exchange Act?*

As in all cases brought under § 10(b) and Rule 10b–5, the Court must decide whether the plaintiff has stated a cause of action under federal law.

■ On appeal, Desser and the co-defendants changed direction. They concede in their brief that the complaint "unquestionably alleges corporate wrongs which are the proper subject of a share-

holder's derivative action [in the state courts]" and that "some derivative actions can be maintained in federal court pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa". They argue however that here the alleged conversion of corporate assets are matters to be dealt with only in state courts. Traditionally, of course, the internal affairs of corporations have been litigated in state courts; fraudulent mismanagement by insiders' looting a corporation is a breach of state-created fiduciary duties. The defendants say that state law adequately handles such situations, and Section 10(b) was not designed to pre-empt state law applicable to fraudulent mismanagement unrelated to the purchase or sale of securities. Thus in *Birnbaum*, 193 F.2d at 464, the Court said:

When Congress intended to protect the stockholders of a corporation against a breach of fiduciary duty by corporate insiders, it left no doubt as to its meaning. Thus Section 16(b) of the Act of 1934, 15 U.S.C.A. § 78p(b), expressly gave the corporate issuer or its stockholders a right of action against corporate insiders using their position to profit in the sale or exchange of corporate securities. The absence of a similar provision in Section 10(b) strengthens the conclusion that that section was directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs. * * *

See also O'Neill v. Maytag, 2 Cir., 1964, 339 F.2d 764, 768.

Notwithstanding this counsel of caution, a large body of federal corporation law is developing on the theory that

volved fraud on the corporation by some, but not all, of the directors, the Court reasoned as follows:

If, in this case, the board defrauded the corporation into issuing shares either to its members or others, we can think of no reason to say that redress under Rule 10b–5 is precluded, though

it would have been available had anyone else committed the fraud. There can be no more effective way to emasculate the policies of the federal securities laws than to deny relief solely because a fraud was committed by a director rather than by an outsider. *Id.* at 29.

Rule 10b–5 is worded broadly and makes actionable any deception "in connection with" the purchase or sale of any security.[15] *See generally* Fleischer, "Federal Corporation Law", An Assessment, 78 Harv.L.Rev. 1146 (1965); Ruder, Pitfalls in the Development of a Federal Law of Corporations By Implication through Rule 10b–5, 59 Nw.U.L.Rev. 185 (1964). O'Neill v. Maytag, 2 Cir., 1964, 339 F.2d 764, and similar cases involving the corporate management issue dealt only with the question whether proof of deception is required under Section 10(b) and Rule 10b–5. They do not hold that, when deception is present, the fact that this deception occurred as part of a larger scheme of corporate mismanagement confers any immunity upon those responsible. As stated in *O'Neill,* "There is, of course, no reason why the acts of an agent or corporate officer may not violate both his common law duty and the duty imposed by Rule 10b–5". 339 F.2d at 768. And as this Court said in *Hooper,* 282 F.2d at 201:

> [Section 10(b)] greatly expands the protection frequently so hemmed in by the traditional concepts of common law misrepresentation and deceit, the requirement of privity, proof of specific damage, inadequacy of the right of rescission or right to recover up to par value of stock of a much greater market value. To these difficulties would have to be added the geographic obstacle of suit in a common forum against multi-state defendants scattered as far as the fraudulent device required.

In A. T. Brod & Co. v. Perlow, 2 Cir., 1967, 375 F.2d 393, 395, the Second Circuit held the alleged fraud came within Rule 10b–5 because it had a "potentially manipulative effect on the securities market". The Court noted:

> Nor do we think it sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is "usually associated with the sale or purchase of securities." We believe that § 10(b) and Rule 10b–5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.

Ruckle v. Roto American Corp., 2 Cir., 1964, 339 F.2d 24 and Schoenbaum v. Firstbrook, S.D.N.Y.1967, 268 F.Supp. 385, aff'd, 2 Cir., 405 F.2d 200, rev'd on other grounds en banc 2 Cir., 1968, 405 F.2d 215, like the instant case, involved defrauded issuers. In *Ruckle,* a majority of the board of directors withheld information from one of the directors before approving the issuance of its own stock to the president for less than adequate consideration. In granting an injunction to shareholders suing derivatively the Court held that the fraudulent issuance of the watered stock would violate Rule 10–b. In *Schoenbaum,* the board of directors approved the issuance of stock to its controlling stockholder at "vastly inadequate prices". The directors, as in this case, were charged with having had full knowledge of the inadequacy of the consideration and were named as co-conspirators and defendants. *Cf.* SEC v. Texas Gulf Sulphur Co., 2 Cir., 1968, (en banc) 401 F.2d 833, 856–857, 864–865. As the Court stated in its first opinion: "A fraud upon a corporation which has the effect of depriving it of fair consideration for the

---

15. Section 10(b) speaks in terms of the use of "any manipulative or deceptive device or contrivance" in contravention of rules and regulations as might be prescribed by the Commission. It would have been difficult to frame the authority to prescribe regulations, in broader terms. Had Congress intended to limit this authority to regulations proscribing common-law fraud, it would probably have said so. We see no reason to go beyond the plain meaning of the word "any," indicating that the use of manipulative or deceptive devices or contrivance of whatever kind may be forbidden, to construe the statute as if it read "any fraudulent" devices. Ellis v. Carter, 9 Cir., 1961, 291 F.2d 270, 272–274.

issuance of its stock would necessarily have the effect of reducing the equity of the corporation's shareholders and this reduction in equity would be reflected in lower prices bid for the shares on the domestic stock market." 405 F.2d at 208.

In Pappas v. Moss, 3 Cir., 1968, 393 F.2d 865, 869, the Third Circuit allowed a shareholder derivative action, squarely holding: "Given evidence sufficient to satisfy the preliminary requirements of the Rule, we think that where, as here, a board of directors is alleged to have caused their corporation to sell its stock to them and others at a fraudulently low price, a violation of Rule 10b–5 is asserted."

The Seventh Circuit arguably has approved of shareholder derivative suits under § 10(b) and Rule 10b–5. In Dasho v. Susquehanna Corp., 7 Cir., 1967, 380 F.2d 262, cert. denied sub nom. Bard v. Dasho, 1967, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470, insiders sold their stock in Corporation A at an excessive price to Corporation B which then merged with Corporation A causing that company to acquire the shares at the excessive price and to assume the loan by which Corporation B's purchase was financed. In addition Corporation A acquired its own shares from another group at an excessive price by paying with undervalued shares of still another corporation. The Seventh Circuit sustained a derivative suit based on these manipulations.

The cases professedly disallowing a federal action under § 10(b) and Rule 10b–5 for corporate mismanagement may perhaps be distinguished on the issue of causation. In *Birnbaum*, the corporation was not a direct party to the allegedly fraudulent transaction; the president of Newport Steel, in his official capacity, rejected a merger proposal from Follansbee Steel, and instead personally sold his control block of Newport stock to Follansbee at a substantial profit. Similarly in the private damage cases, such as Mutual Shares Corp. v.

Genesco, Inc., 2 Cir., 1967, 384 F.2d 540, there was no direct dealing between the plaintiff and the perpetrator of the alleged fraudulent stock transaction. The hesitancy of courts to grant a cause of action under Rule 10b–5 when the causal connection between the fraud and the injury is not readily apparent, as when there is no direct dealing between the parties, may explain in part, at least, the diverse results. See Commerce Reporting Co. v. Puretec, Inc., S.D.N.Y. 1968, 290 F.Supp. 715.

Here the complaint alleges that Desser fraudulently caused World-Wide to issue treasury shares to him for inadequate consideration. The complaint alleges that the note for $782,000 was fraudulently inflated. There was direct dealing between the corporation and Desser. This case appears to be maintainable under *Hooper*, also involving an issuer, although in *Hooper*, the corporation was defrauded by an outsider.

In Pettit v. American Stock Exchange, S.D.N.Y.1963, 217 F.Supp. 21, 25, the court held that the mere fact that the "fraud was perpetrated by insiders does not render Section 10(b) inapplicable, if the transaction represents an abuse of the securities trading process". The court emphasized in that case, however, that more than mismanagement was involved; the overall fraudulent scheme depended upon sale of the stock through the facilities of the American Stock Exchange. In New Park Mining Co. v. Crammer, S.D.N.Y.1963, 225 F.Supp. 261, the court reached a similar result although it declined to emphasize the use of security-trading processes as an essential part of the fraudulent scheme.

It is immaterial whether the purchase or sale was part of a larger scheme of corporate mismanagement if the elements of a claim under Section 10(b) and Rule 10b–5 are otherwise present. * * * Were this not the rule, corporate officers and directors would possess an immunity from the consequences of their fraud under Section 10(b) and Rule 10b–5 which outsiders

who may have collaborated with them in defrauding the corporation would not possess. Id. at 266. The allegedly fraudulent schemes in both *Pettit* and *New Park* consisted of the transfer of worthless assets by insiders to the corporation in exchange for stock.

■ We conclude, therefore, that when officers and directors have defrauded a corporation by causing it to issue securities for grossly inadequate consideration to themselves or others in league with them or the one controlling them, the corporation has a federal cause of action under § 10(b) and Rule 10b–5, notwithstanding that the perpetrators of the fraud are corporate insiders liable under state law.[16] The essence of the transaction is not significantly different from fraudulent misrepresentation perpetrated by one individual on another. In both cases a security transaction is the vehicle for the fraud; § 10(b) and Rule 10b–5 are to protect against fraudulent security transactions.

III. *The Rule 15d–1 Action.* Rekant makes the novel contention that the violation of Rule 15d–1 confers a private right of action for its violation independent of the Rule 10b–5 violation. *Cf.* J. I. Case Co. v. Borak, 1964, 377 U.S. 426, 432, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423, upholding "private enforcement of the proxy rules * * * [as] a necessary supplement to Commission action".

We find it unnecessary to determine this question. In the circumstances this case presents, § 10(b) and Rule 10b–5 overlap § 15(d) and Rule 15d–1.[17] The complaint alleges the fraudulent issuance of World-Wide's stock to Desser and the fraudulent issuance of the note for $782,000 for grossly inadequate consideration. Desser was able to deceive the shareholders initially by making affirmative misrepresentations in the 1965 report which induced the shareholders not to sell their stock and not to take protective action. Then by *not* filing the 1966 report the directors were able to conceal the fraud from the shareholders while continuing, allegedly, to plunder the corporation. This omission violated the directors' duty to disclose fully the material facts relating to the Henry Hudson Hotel and the River Oaks Farm transactions. Although the plaintiff's complaint does not clearly articulate this theory of the case,[18] it is evident that the filing of the 1965 report and the failure to file the 1966 report were vital elements in the over-all scheme to defraud and that this scheme was accomplished "in connection with the purchase or sale of securities" to which § 10(b) and Rule 10b–5 refer. Recovery, if there be recovery, under § 10(b) and Rule 10b–5 will provide the same relief sought under § 15(d) and Rule 15d–1.

\* \* \* \* \* \*

IV. *Greenbreak appeal.* On appeal, Greenbreak, Inc., defendant-appellee, filed a separate brief pointing out that

16. "There can be no more effective way to emasculate the policies of the federal securities laws than to deny relief solely because a fraud was committed by a director rather than an outsider." Ruckle v. Roto American Corp., 2 Cir., 1964, 339 F.2d 24, 29.

17. *Cf.* "When to conduct actionable under § 11 of the 1933 Act there is added the ingredient of fraud, then that conduct becomes actionable under [10b–5]." Fischman v. Raytheon Mfg. Co., 2 Cir., 1951, 188 F.2d 783, 787. "Rule 10b–5 appears to cover acts not specifically mentioned by it but expressly prohibited by a

variety of other provisions * * *, an absorption into 10b–5 * * * not unlike that by which the due process clause of the fourteenth amendment seems to be absorbing the Bill of Rights. * * *" Bromberg, Securities Laws: Fraud— Rule 10b–5, §§ 2.4(4) and 2.5(1), p. 40.1–41 (1969).

18. A complaint states a cause of action if, on any legal theory, the facts entitle the plaintiff to recover. 1A Baron & Holtzoff, Federal Practice and Procedure § 276.1 (Wright ed. 1960) ; 2A Moore, Federal Practice § 8.141 (2 ed. 1968).

the corporation was a purchaser of the River Oaks Farm; that it was not a director or under any duty to World-Wide or its stockholders. The amended complaint, however, alleges that Greenbreak and others "wrongfully participated as co-conspirators". On remand, the trial court should determine whether World-Wide issued treasury stock to Greenbreak and whether the facts support the plaintiff's conspiracy theory.

Accordingly, we reverse and remand for proceedings consistent with this opinion.