**NOR–TEX AGENCIES, INC., and W. E. Riley, Plaintiffs-Appellees,**

v.

**Richard M. JONES, Defendant-Appellant, Charles Owen and Continental National Bank of Fort Worth, Defendants-Appellees.**

**No. 72–2707.**

United States Court of Appeals, Fifth Circuit.

July 26, 1973.

Rehearing Denied Oct. 11, 1973.

Clyde M. Marshall, Jr., Fort Worth, Tex., for defendant-appellant.

Henry W. Simon, John W. Hughes, Fort Worth, Tex., for Nor-tex & Riley.

Terry W. Gardner, Thomas H. Law, Fort Worth, Tex., for Owen.

Ogden K. Shannon, Jr., Fort Worth, Tex., for Continental National Bank.

Before AINSWORTH, GODBOLD and CLARK, Circuit Judges.

AINSWORTH, Circuit Judge:

The district court found the transactions here to involve securities sold through material misrepresentations, in violation of the anti-fraud provisions of federal securities laws, and ultimately awarded relief on various claims by plaintiff Nor-Tex Agencies, Inc. against defendant Richard M. Jones, by plaintiff W. E. Riley against defendants Jones and Charles Owen, and by cross-claimant Owen against defendant Jones, subject to rights of the Continental National Bank of Fort Worth as holder of notes issued by the claimants.

The facts, stated chronologically, begin in April 1967 when Jones approached Owen with the idea of purchasing a 420-acre tract of land in Bexar County, Texas, from Robert Maddox at a price of $260,000. Of interest to Owen were Jones's representations concerning oil and gravel deposits on the property. Owen and Jones together with another potential buyer, James Williford, looked at the property on April 23, 1967, and on this occasion Jones reaffirmed that the purchase price from Maddox was $260,000. On April 28, 1967, Jones told Owen that Maddox would hold the offer open another thirty days if they put up a total of $21,000 for an option. On May 1, 1967, Owen wrote a check to Jones for $14,000, representing his and Williford's share of the price for the op-

tion, and on the same day Jones wrote and mailed to Owen a letter confirming the terms of their verbal agreement. When Williford was unable to arrange financing for his share of the purchase price, Jones suggested that Owen and Jones go ahead on a "fifty-fifty" basis. On May 31, 1967, Owen gave Jones a check for $36,333.33 and a promissory note for $79,666.67, which with Owen's earlier check for $14,000 amounted to a total investment for Owen of $130,000. Jones and his wife took title to the property and then conveyed to Owen an undivided one-half interest in the surface, an undivided one-half interest in the mineral estate subject to an existing oil and gas lease covering the south 200 acres, and an undivided one-half interest in the existing lease entitling the owners to share a one-sixth royalty.

During the negotiations Jones warned Owen not to contact Maddox directly, because Jones had a special deal which could be ruined if Owen intervened. Furthermore, Jones said he made a sacrifice to enter the deal himself, because his wife had to sell her fur coat and Cadillac in order for Jones to raise his half of the money. However, when a deposition was taken in connection with this case on January 5, 1970, Owen learned that Jones actually purchased the property from Maddox for $125,000 instead of the $260,000 represented to Owen.

In July of 1968 Jones met Riley and interested him in the Bexar County property. Jones subsequently telephoned Riley and arranged another meeting. At this next meeting Jones told Riley of plans to develop the oil resources with his "partner" Owen, and that Riley could have one third of their interest in the 420-acre tract for $100,000. A few days later Jones, Owen and Riley traveled in a private airplane to inspect the property. In addition to giving Riley a brochure outlining tax and financial prospects, Jones further assured Riley that his investment could be recovered within two years. Jones

said he would purchase the outstanding production lease within six months and that there was a contract offer pending which would pay them $25,000 per year for gravel. Riley, during the return flight, gave his verbal commitment to invest, and Riley eventually paid Jones and Owen $56,222.22 cash and gave a promissory note for $43,777.78. Later, the outstanding lease was not acquired and the return for all three parties on the Bexar County property was negligible.

During the same airplane flight above referred to, Jones also discussed with Riley the possibility of embarking on a program of acquiring working interests in oil leases on other property. As worked out later, the basic plan was for a corporation, Nor-Tex, controlled by Riley to put up the money for drilling the wells. Jones itemized the cost of each well at about $32,000 for a complete well and $10,000 for a dry well. In return Nor-Tex would get 75 per cent of the working interest in the mineral lease, Jones would retain 25 per cent of the working interest, and Nor-Tex would reassign 25 per cent of the working interest to Jones after Nor-Tex received all of its money back for the drilling expenses. Jones assured Riley that the wells would not be "wildcats," but rather holes in a "proven area," so that they could count on production of the maximum allowable twenty barrels per day for each well and sell the oil at $2 per barrel.

In September of 1968 Riley in his capacity as president of Nor-Tex signed the first agreements with Jones relating to wells to be drilled on what were called the Turner and Harris leases. To enable Jones to get started with the drilling, Nor-Tex borrowed money with Riley's personal guarantee and made several $50,000 advances to Jones.

Instead of $32,000, the cost to Jones of drilling a complete well was substantially less than that amount. Furthermore, several of the holes drilled were dry, and Jones's cost was substantially

less than the $10,000 Nor-Tex agreed to pay.

Based on Jones's glowing reports, Riley decided sometime in December that Nor-Tex should go ahead with more commitments. Jones suggested they purchase two producing wells on the so-called Styles lease and drill three more wells. Riley closed the transaction on January 9, 1969 for Nor-Tex by agreeing to pay $20,000 for 75 per cent of the working interest in the two producing wells and to pay the usual price for Jones to drill additional wells. What Jones did not tell Riley was that Jones had acquired the Styles lease in early December for only $5,500.

Riley made a final commitment in February of 1969 for Nor-Tex to purchase 75 per cent of the working interest in ten producing wells on the Glenwood lease at a price of $110,000 and for Nor-Tex to pay Jones the usual price for additional wells. Jones failed to advise Riley that Jones acquired the lease for $46,000.

When it became evident that the wells were not producing according to Jones's representations, Nor-Tex brought this suit against Jones for rescission and compensatory damages on September 9, 1969, alleging that Jones induced Nor-Tex to buy securities through various misrepresentations in contravention *inter alia* of section 12(2) [1] of the Securities Act of 1933, 15 U.S.C. § 77*l*(2) (1970), and Securities and Exchange Commission Rule 10b–5,[2] 17 C.F.R. § 240.10b–5 (1972), promulgated under section 10(b) [3] of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970). During the taking of a deposition on January 5, 1970, it became evi-

1. Section 12(2) reads as follows:
   Any person who—

   .    .    .    .    .

   (2) offers or sells a security (whether or not exempted by the provisions of section 3, other than paragraph (2) of subsection (a) thereof), by the use of any means or instruments of transportation or communication in interstate commerce, or of the mails, by means of a prospectus or *oral communication*, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

2. Rule 10b–5 reads as follows:
   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

   (1) To employ any device, scheme, or artifice to defraud,

   (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

   (3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
   in connection with the purchase or sale of any security.

3. Section 10(b) reads as follows:
   Section 10. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

   .    .    .    .    .

   (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

dent that Jones also defrauded Riley and Owen in the transactions relating to the Bexar County property, and the complaint was amended on June 30, 1970 to add Riley as a plaintiff and Owen and the Bank as defendants. Owen then filed a cross-complaint against Jones asking for $67,500 damages, representing the difference between the $130,000 Owen paid to Jones and the $62,000 (one half the price Jones paid Maddox) Owen should have paid Jones for a half interest.

■ Each claim herein presents a question cognizable under federal statutes and meets the $10,000 jurisdictional amount of 28 U.S.C. § 1331 (1970). *See also* Securities Act of 1933 § 22(a), 15 U.S.C. § 77v(a) (1970); Securities Exchange Act of 1934 § 27, 15 U.S.C. § 78aa (1970); Kasner v. H. Hentz & Co., 5 Cir., 1973, 475 F.2d 119, 120. We hold that Jones sold "securities," thus fulfilling a condition precedent to application of the anti-fraud provisions of the federal securities laws. *See* Securities Act of 1933 § 12(2); SEC Rule 10b–5. There is no doubt that Jones used the mails to perpetrate his scheme, thus satisfying another requirement of the anti-fraud provisions. *See* Securities Act of 1933 § 12(2); SEC Rule 10b–5.

At the close of the evidence, the district judge submitted to the jury under Rule 49(a) of the Federal Rules of Civil Procedure, numerous written special issues to determine whether Jones actually perpetrated fraud on each claimant. The jury found that Jones, for the purpose of inducing Owen to buy an interest in the Bexar County property, made materially untrue statements of fact relied upon by Owen which Jones knew to be untrue, and which fraud Owen could not have discovered through the exercise of ordinary care until January 5, 1970, thereby causing Owen damages of $67,500. Rule 10b–5 forbids such making of "any untrue statement of a material fact" in connection with the sale of a security, and has been held to grant a private remedy for the amount of damages based on the difference between the price paid and fair market value of the security at the time of the transaction. *See generally* 2 A. Bromberg, Securities Law § 9.1, pp. 227–28 (1971); J. R. Lewis, Inc. v. Newman, 5 Cir., 1971, 446 F.2d 800, 805. The district judge granted judgment in favor of Owen and against Jones for $67,500. To assure Owen's recovery, the district judge granted a lien and impressed a trust on Jones's interest in the Bexar County property, subject to the superseding claims of the Bank and Riley. The jury found that Jones made his offers to Riley and Nor-Tex (through Riley) by means of a prospectus or oral communication which included untrue statements of material facts which Jones knew to be false, and that Riley relied upon the statement and could not have known by the exercise of reasonable care about such untruths until July 3, 1969, thus entitling plaintiffs to the standard remedy of rescission on all their transactions with Jones for his violation of section 12(2). The jury additionally found that Jones's false statements to Riley in connection with the Bexar County property were not made with the authorization or knowledge of Owen but were made within the purposes of the joint venture of Jones and Owen. In the judgment Owen was vicariously held liable with Jones to grant Riley rescission.

Jones raises eighteen points of error on this appeal. All of these points of error have been considered by us following a thorough study of the record and with the benefit of extensive briefs and oral argument. None of these points warrants modification of the judgment. Only the following main points are discussed below.

I.

At issue initially is the question whether Jones sold a "security" in each of the transactions. *See generally* L. Loss, Securities Regulation 469–96 (1961), Supplement 2495–2509 (1969). According to his brief, "Appellant still

insists that the Bexar County sales did not involve securities . . . . Irrespective of the answer to this issue, however, he respectfully submits that the evidence conclusively shows that all of the transactions, both Bexar County and the Nor-Tex leases, were isolated intrastate contracts, made by private negotiations, without advertisement or public offer, between Texas residents only, with each purchaser being equal or superior to Jones as to business experience, knowledge or access thereto, and ability to fend for self without need for protection of the securities acts, so that such transactions would be exempt, as a matter of law . . . ."

Section 2(1) of the Securities Act of 1933, as amended, 15 U.S.C. § 77b(1) (1970) defines a "security" as "any note, stock . . . certificate of interest or participation in any profit-sharing agreement, . . . investment contract, . . . fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security'." *See also* Securities Exchange Act of 1934 § 3(a)(10), 15 U.S.C. § 78c(a)(10) (1970). The term "security" must be given a broad and flexible construction so that the remedial purpose of the anti-fraud provisions will be effectuated. *See* Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); Herpich v. Wallace, 5 Cir., 1970, 430 F.2d 792, 802; Rekant v. Desser, 5 Cir., 1970, 425 F.2d 872, 878.

Owen, Riley, and Nor-Tex were induced by Jones to speculate in fractional undivided oil and gas interests, and were led to expect profit from Jones's efforts. At the time of his purchase Owen obtained the right to receive an undivided one-half interest of a one-sixth royalty interest existing on the Bexar County property. By his later purchase Riley obtained an undivided one-third interest in the same one-sixth royalty. Each of Nor-Tex's contracts provided for the acquisition of part of a working interest in the oil lease, and the wells were already producing or to be drilled by Jones. Accordingly, the contracts were securities within the contemplation of the federal securities laws. *See generally* Securities and Exchange Commission v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943); Graham v. Clark, 6 Cir., 1964, 332 F.2d 155; Moses v. Michael, 5 Cir., 1961, 292 F.2d 614, 618–619.

Furthermore, we find that Owen, Riley and Nor-Tex made "investment contracts" with Jones which were securities within the contemplation of the federal securities laws. *See generally* Securities and Exchange Commission v. MacElvain, 5 Cir., 1969, 417 F.2d 1134, 1136–1137, cert. denied, 397 U.S. 972, 90 S.Ct. 1087, 25 L.Ed.2d 265 (1970); Lynn v. Caraway, 5 Cir., 1967, 379 F.2d 943, cert. denied, 393 U.S. 951, 89 S.Ct. 373, 21 L.Ed.2d 362 (1968); Roe v. United States, 5 Cir., 1961, 287 F.2d 435, cert. denied, 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29 (1961), on appeal after remand, 5 Cir., 1963, 316 F.2d 617, 620. Thus, the district judge posed a special issue to the jury whether or not plaintiff Riley's transaction with defendants Jones and Owen was an investment contract. An investment contract was defined by the trial judge in instructions to the jury on the basis of the Supreme Court decision in Securities and Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946), as follows:

You are instructed that an investment contract is a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. In an investment contract the investor provides capital and shares in the earnings and profits; others manage, control and operate the enterprise.

The jury answered affirmatively that the transaction was an investment contract. This conclusion was fully sup-

ported by the evidence. Riley contributed the investment capital and depended on Jones to manage the enterprise and develop a profit through his expertise in the oil and gas field. The terms and purpose of Owen's contract with Jones were essentially the same as Riley's contract with Jones and Owen. Nor-Tex's contracts with Jones expressly depended upon Jones to drill the oil wells with Nor-Tex's capital investment.

■ The jury finding that Owen and Jones were joint venturers was not inconsistent with the fact that this was an investment contract in which Jones was expected to take the initiative in any development of the enterprise. It was anticipated that Owen would remain comparatively passive. *See generally* R. Jennings & H. Marsh, Securities Regulation 308–09 (1972) (for a discussion of joint venture and partnership interests as securities).

■ We do not understand the relevance of appellant's contentions that all the transactions were isolated intrastate contracts engaged in without a public offer by purchasers with equal or superior business experience to Jones. As this Court said in Stier v. Smith, 5 Cir., 1973, 473 F.2d 1205, 1207, "sophisticated investors, like all others, are entitled to the truth." *See also* Lehigh Valley Trust Co. v. Central National Bank of Jacksonville, 5 Cir., 1969, 409 F.2d 989, 992. Moreover, here neither Owen nor Riley had extensive oil and gas experience prior to their transactions with Jones, who had superior knowledge of the particular transactions involved in this case. The jury found that public offers were made by Jones. However, even if the transactions were isolated intrastate contracts made pursuant to private offers, the sales of securities were still subject to the anti-fraud provisions of the federal securities acts. *See generally* Hill York Corp. v. American International Franchises, Inc., 5 Cir., 1971, 448 F.2d 680, 695; 1 Bromberg, *supra*, § 4.6, p. 82.

Thus, section 3(a)(11) of the Securities Act of 1933, 15 U.S.C. § 77c(a)(11) (1970) states the so-called intrastate exemption as follows: "Except as hereinafter expressly provided, the provisions of this subchapter shall not apply to any of the following classes of securities: . . . [a]ny security which is part of an issue offered and sold only to persons resident within a single State or Territory, where the issuer of such security is a person resident and doing business within or, if a corporation, incorporated by and doing business within, such State or Territory." But the anti-fraud provision of section 12(2) is expressly applicable without regard to whether the security falls within the exemption of section 3(a)(11). Likewise, Rule 10b–5 of the '34 act is not subject to the intrastate exemption stated in the '33 act. *See* Securities Exchange Act of 1934 § 3(a)(12), 15 U.S.C. § 78c(a)(12) (1970); 2 Bromberg, *supra*, § 4.6, p. 82 (1971).

The so-called private offer exemption of section 4(2) of the Securities Act of 1933, 15 U.S.C. § 77d(2) states: "The provisions of section 5 shall not apply to . . . transactions by an issuer not involving any public offering." By its express terms, the private offer exemption only exempts a transaction from the registration requirements of sections 5, 15 U.S.C. § 77(e) (1970), and 12(1), 15 U.S.C. § 77l(1) (1970), and does not exempt a transaction from the anti-fraud provisions of sections 12(2) of the '33 act or Rule 10b–5 under the '34 act.

## II.

The second major issue in this case concerns the district judge's approval of Nor-Tex's amended complaint which added Riley as a plaintiff and Owen and the Bank as defendants, followed by Owen's filing a cross-complaint against Jones. In the trial below, Jones moved to sever the Nor-Tex action for a separate trial, but the district judge denied the motion. On appeal Jones objects to Riley being in this case, because Riley

was allegedly an "intervening stranger" who sought recovery on an "unrelated cause of action in which Nor-Tex had no interest."

■ The addition of Riley was permissible under Rule 20(a), Federal Rules of Civil Procedure, because his claim arose from the same series of occurrences as Nor-Tex's claim, and the claims presented common questions of law and fact. Both Nor-Tex's and Riley's claims were based on a series of false statements made by Jones, such as were made on the day Jones flew with Riley and Owen to inspect the Bexar County property. Both claims present common questions of law concerning the definition of a security and common questions of fact whether Jones's statements were false.

The district judge acted within his discretion in allowing the joinder under Rule 20(a), as well as denying the motion for severance under Rule 20(b). *See also* Rules 13, 42, Fed.R.Civ.P. As noted above, Jones's scheme to defraud Nor-Tex was only one chapter in a larger plot to also defraud Riley and Owen. The defendant was not prejudiced by the addition of Riley and Owen, because testimony about them was unavoidable in the Nor-Tex action. In dealing with Nor-Tex, Jones negotiated with Riley. Nor-Tex's transactions stemmed from Riley's flight with Owen and Jones to the Bexar County property, so the facts concerning Nor-Tex were inextricably woven together with the facts concerning Owen and Riley.

Appellant relies upon Dupont v. Southern Pacific Company, 5 Cir., 1966, 366 F.2d 193, cert. denied, 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 106 (1967), where the district judge consolidated the cases of four plaintiffs who had differing theories of recovery and ordered the designation of a lead counsel for all four plaintiffs. Because of the resulting confusion and because the consolidation created a conflict of interest for the lead counsel, we reversed and remanded for severance and new trials. Unlike *Dupont,* here the consolidation did not deprive Riley of effective assistance of counsel or require him to present inconsistent theories. His defensive stance would have been the same even if the claims were tried separately. The fairest and most expeditious way to dispose of these claims was to try them together.

### III.

In his answers to the amended complaint and to the cross-claim, Jones filed counterclaims against Riley and Owen to collect on overdue notes given in connection with the Bexar County property. Because the notes were in default, Jones sought to accelerate the maturity and foreclose on the security, which was the interest Riley and Owen had each purchased in the property. Named as voluntary or involuntary plaintiff, "whichever it shall elect," was the Bank to which the notes had subsequently been pledged.

■ The Bank moved to dismiss the counterclaims, and the district judge correctly granted the motion. According to the express terms of the pledge agreement the Bank was granted "possession and custody of the Collateral [the notes] until the Obligations are fully paid" thereby precluding Jones from foreclosing.[4]

---

4. Jones nevertheless contends on appeal that a "pledgee has a duty of reasonable diligence to collect on the pledged note, and certainly has a duty to seek recovery when the maker of the note institutes suit to cancel same, joining both pledgor and pledgee." Appellant cites the following Texas authorities in support of his contention: 46 Tex.Jur.2d § 8, p. 202 et seq.; Liner v. J. B. Wat-

kins Land Mtge. Co., 68 S.W. 311 (Tex. Civ.App.1902); and Wise v. Cecil, 135 S.W.2d 235 (Tex.Civ.App.1939).

The Texas Jurisprudence text at pages 207 and 208 establishes the proposition that the pledgee is bound to take certain measures for the collection of the sum due from the maker. *Liner* is cited at 46 Tex.Jur.2d at 203 n. 7 for the proposition that the pledgor may also sue

Under the circumstances, the contentions of Jones are without merit and the judgment appealed from is affirmed.

but that the pledgee should be joined as a party. Neither of these authorities is apposite here in that the parties varied the general rules on the pledgee's duty by stipulating that the "Bank . . . will not have any duty to take steps to preserve rights against prior parties or enforce collection of collateral by legal proceedings or otherwise, Bank's sole duty being to use only reasonable care in the custody and physical preservation of the collateral in the Bank's possession." *Wise* is cited at 46 Tex.Jur.2d at 206 n. 6 for the proposition that it is the duty of the pledgee to protect pledgor to the extent that security shall not be sacrificed, such as in the event of some bankruptcy proceeding. The Bank's action here could not have helped Jones, since the claims of rescission by Riley and damages by Owen depended upon Jones's fraud at the inception of the original transactions. The claims against Jones could not be affected by later inaction of the Bank.