Joe L. SMALLWOOD, Plaintiff-Appellant,

v.

PEARL BREWING COMPANY, Southdown, Inc., Zapata Norness, Inc., Albert J. Range and D. Doyle Mize, Defendants-Appellees.

No. 72-2342.

United States Court of Appeals, Fifth Circuit.

Feb. 19, 1974.

John L. Hauer, Robert E. Goodfriend, Dallas, Tex., for plaintiff-appellant.

John C. Held, William C. Harvin, Houston, Tex., J. Burleson Smith, San Antonio, Tex., Stanley McMurry, Dallas, Tex., for defendants-appellees.

Before WISDOM, DYER and INGRA-HAM, Circuit Judges.

WISDOM, Circuit Judge:

This appeal raises a variety of difficult questions under the Securities Exchange Act of 1934. Suing individually, as the representative of a class, and derivatively, Joe L. Smallwood, plaintiff-appellant, charged the defendants with a multitude of sins, including violations of the Proxy Rules, the tender offer provisions of the Williams Act, and Rule 10b–5. The defendants demanded a jury trial. After special issues were submitted to the jury and returned, the district court ruled that no violations of the securities laws had been established. We affirm.

## I.

### FACTS

The story begins innocuously enough in the summer of 1968 with the commencement of a search by Pearl Brew-

ing Company for a suitable merger partner.[1] Seeking further diversification, Pearl, a Texas corporation engaged in the manufacture of beer, soft drinks, and candy, rejected feelers from other firms in the consumer foods industry. Then, in the spring of 1969, three new merger candidates appeared—Aztec Oil & Gas Company, Infotech, and Southdown, Inc. Infotech was a start-up enterprise with no business history, and its merger offer was quickly dismissed. Aztec, a natural gas producer, offered a straight stock-for-stock exchange. Southdown, a Louisiana corporation with interests in sugar production, oil and gas, and real estate, originally offered to purchase a controlling interest in Pearl stock for cash.[2] After some preliminary negotiations, Southdown altered its proposal to provide the option of a stock-for-stock exchange in a tax-free merger.[3] The Aztec and Southdown proposals were referred to Duff, Anderson & Clark, Inc., a Chicago financing and consulting firm, for study.

On June 26, 1969, representatives of Duff, Anderson & Clark orally reported to the Pearl Board of Directors that in their opinion both proposals would benefit Pearl, but that the Aztec offer was slightly the better of the two because it had "more upside potential near term". When the Pearl Board met again on July 7, 1969, representatives of Aztec and Southdown appeared to present their proposals. After the presentations, one of Pearl's attorneys reported to the Board that El Paso Natural Gas Company, Aztec's chief customer, was under no obligation to continue purchasing gas from Aztec. The Pearl Board then informally indicated its approval of the Southdown proposal and instructed Pearl's attorneys to meet with Southdown's attorneys in an attempt to work out a merger agreement.

A merger agreement between Pearl and Southdown was approved by the Pearl Board on July 11, 1969. The agreement provided that Pearl would be merged into Southdown and that for each share of Pearl common stock owned a shareholder would receive one share of Southdown convertible preferred stock. Pearl's obligation to consummate the merger was subject to "the fulfillment (or waiver by Pearl in writing)" of certain conditions, the most important of which would permit Pearl shareholders to "sell out" at least 45 percent of their newly acquired Southdown preferred stock on consummation of the merger for $45 a share:

> "Southdown shall have procured a firm commitment from a group of underwriters (which commitment shall be satisfactory in form and substance to the Board of Directors of Pearl) by which such underwriters will agree, for a period of ten days following the Effective Date, to purchase from those stockholders who desire to sell the same, at a price of $45 net per share, up to 45 percent of the shares of Southdown Preferred Stock into which the shares of Pearl Stock held by such stockholders on the Effective Date will have been converted upon consummation of the merger."

Testimony at trial indicated that the purpose of requiring Southdown to gain a firm underwriting commitment was to accomplish the sell-out provision of the plan without making the merger taxable to Pearl shareholders. Although Southdown was willing to buy up to 45 per-

---

1. The underlying reasons for Pearl's search for a merger partner were (1) the increased competition national breweries exerted on regional breweries and (2) the illness of its chief executive, Otto Koehler.

2. In August 1969 Southdown acquired Canal Assets, Inc., which was engaged in rice milling and irrigation, and owned land and mineral interests.

3. Southdown's proposal was that "the present owners of the controlling interest in Pearl (i. e. holders of at least 45% of the outstanding Pearl stock) would enter into an agreement with [Southdown] to sell their stock for $45 per share in cash or, at their option, in exchange for Southdown's $1.80 Cumulative Convertable Preferred Stock in a tax-free merger".

cent of Pearl's stock for cash, Pearl's attorneys were of the opinion that if Southdown paid cash in addition to securities the merger would lose its tax-free status under Section 354 of the Internal Revenue Code of 1954, and the exchange of shares in the merger would become a taxable event to Pearl shareholders. Jack Guenther, one of Pearl's attorneys, testified that in his negotiations with Southdown he obtained the Pearl Board's right to waive the underwriting commitment so that Southdown could not avoid the merger by failing to procure an underwriting commitment. The purpose of the waiver power was explained to the Board when the Board approved the merger agreement. There was no testimony that it was anticipated at that time that an underwriting commitment would not prove possible. To the contrary, Guenther had received confirmation from Lehman Brothers, an investment banker, that a firm commitment was feasible.

According to testimony in the record the provision that the underwriters would purchase "for a period of ten days following the Effective Date . . . from those stock holders who desire to sell" was intended to indicate when the underwriters would purchase, not when shareholders would tender their shares for sale. The testimony at trial was that permitting shareholders ten days after the merger to tender their shares for sale to underwriters would be inconsistent with underwriters' requirements that they know before purchase the number of shares they must market.

On July 17, 1969, Pearl advised its shareholders by mail of the proposed merger with Southdown. The letter indicated that both the Pearl and the Southdown Boards of Directors believed the merger to be mutually beneficial and recommended shareholder approval. Enclosed with the letter was a copy of a press release describing the basic terms of the merger proposal and stating: "It is a condition to Pearl's obligation to consummate the merger that, on the effective date of the merger, Southdown shall have obtained an underwriting commitment affording the former Pearl stockholders the opportunity to sell, at $45.00 net per share, up to 45% of the Southdown preferred stock received by them in the merger." The power of the Pearl Board to waive the underwriting commitment was not mentioned.

Pearl management communicated again with the shareholders on August 12. The materials distributed that day included a cover letter, a notice of a special shareholders meeting to be held on September 9, 1973, a proxy, and a proxy statement with appendices. The first sentence of the proxy statement referred the reader to the merger agreement between Pearl and Southdown and indicated that a copy of the agreement could be found attached as Appendix II. The agreement, of course, contained the conditions of Pearl's obligation to merge written in full, including the power of the Pearl Board to waive them. Nowhere else in the materials was the waiver power mentioned, although the underwriting condition was referred to four times.

The proxy statement revealed that Albert Range, Executive Vice President of Pearl, would be employed by Southdown under a five-year employment contract at $75,000 per annum and that Range would become a director of Southdown. Moreover, the proxy statement indicated, as a result of the merger Range's 2,620 shares of Pearl stock would be converted into an equal number of Southdown shares. Although during preliminary negotiations between Southdown and Pearl, D. Doyle Mize, the Chairman of Southdown's Board, had promised Range a stock option of 25,000 shares, the proxy materials did not disclose that fact.

On September 9, 1969, the shareholders voted 1,253,337 shares to 35,449 in favor of the merger. December 10, 1969, was tentatively set as the merger date.

To implement the sell-out provision of the merger agreement, Southdown mailed to the Pearl shareholders, on No-

vember 18, 1969, a cover letter, a draft of an underwriting agreement, a preliminary prospectus, and forms. The cover letter restated Southdown's obligation to obtain an underwriting commitment, but did not refer to the ten-day period following the merger during which the underwriters would purchase the stock. The shareholders were informed that to sell their shares of Southdown preferred stock to the underwriters upon consummation of the merger they must tender their Pearl stock certificates, with the appropriate deposit forms, to be in the hands of designated exchange agents "prior to 3:30 p. m., EST, on December 2, 1969". By December 2 approximately 545,000 shares, about 58.5 percent of the outstanding Pearl stock, had been deposited.

Through the summer and into the fall of 1969 the price of Southdown common stock had run counter to a general downward trend in the securities market. Testimony indicated that Lehman Brothers had continued to believe, and communicated this belief to Pearl's attorneys and Southdown, that a syndicate of underwriters would purchase up to 45 percent of the Southdown preferred stock at $45 a share. Late in November, however, the price of Southdown common declined precipitously. Lehman Brothers communicated to Southdown that an underwriting for more than 250,-000 shares would not be possible. After talking to Mize on December 3, Range wrote to 25 Pearl shareholders, each of whom owned 5,000 or more shares, of Pearl stock. He requested that those addressees who had deposited more than 25 percent of their stock for sale reduce their deposit to 25 percent. In response to this request, the number of deposited shares was reduced to approximately 255,000. Negotiations continued between Southdown and Lehman Brothers, but as the price of Southdown common continued to drop, an underwriting for even 255,000 shares became increasingly doubtful. Southdown discussed with Lehman Brothers indemnifying the underwriters for a loss of up to $1,000,000

on the resale of the Southdown preferred. Although Lehman Brothers tentatively agreed to this plan, the value of Southdown stock dropped to the point where Lehman Brothers considered that even $1,000,000 was insufficient.

While serious discussions were still continuing between Southdown and Lehman Brothers, on December 13 discussions began between Southdown and Zapata Norness, Inc., a controlling shareholder of Southdown. According to Mize's testimony, talks with Zapata were initiated on the theory that if Southdown should pay $1,000,000 to obtain buyers for the 255,000 deposited shares, it should pay that amount to Zapata. The idea of paying Zapata $1,000,000 to purchase the shares of Southdown preferred was discarded when Southdown was advised by its attorneys that such a payment would cause the merger to be considered a taxable transaction. Nevertheless, discussion with Zapata continued, and Zapata agreed to purchase the deposited shares for $45 a share.

The merger agreement provided that it was terminable by either party unilaterally if the merger was not consummated by December 31. On December 22, 1969, the Board of Directors of Pearl met to consider the status of the merger plans. At the meeting, the Pearl Board voted to accept Zapata's offer and approved the consummation of the merger. On December 30, 1969, Southdown and Pearl merged. Zapata then purchased the deposited shares for $45 each.

At the trial below the jury found that immediately before the merger on December 30 Pearl common stock was worth $45 a share. Each share of Southdown preferred would have been worth $45 had the merger been consummated "in accordance with the terms and conditions set forth in the agreement and plan of merger". The jury found, however, that on actual consummation of the merger each share of Southdown preferred was worth only $37.80. Still, the price of Pearl stock had risen from about $30 to over $40 during the summer and fall of 1969.

Had the merger plans been abandoned, the jury found, Pearl stock would have plummeted to $21.80 per share.

Joe Smallwood, the plaintiff-appellant, owned 200 shares of Pearl stock and acted as custodian for 600 shares owned by his daughters. He attempted to tender these 800 shares pursuant to the November 18 letter, but he missed the deadline of 3 P.M., December 2, 1969, and his tender was rejected. On February 5, 1970, he filed an individual, class, and derivative suit against Pearl, Southdown, Zapata, Albert Range, and D. Doyle Mize, alleging violations of Sections 10(b), 14(a), and 14(e) of the Securities Exchange Act of 1934 and Rules 10b–5, 14a–3(a), 14a0(a) and 14d–1 promulgated thereunder.[4] The district court defined the plaintiff's class as: "All those who were shareholders of Pearl Brewing Company on August 8, 1969 [the record date for the special shareholders meeting to vote on the merger] except Albert J. Range, those Pearl shareholders who later sold 100% of their Southdown preferred stock to Zapata Norness, Inc. for $45 per share, and those stockholders who have advised the Court prior to receipt of 'Notice of Class Action' of their desire not to be included in the class."

After a lengthy trial, the case was submitted to the jury on special issues. In addition to its findings on the market values, described above, the jury found:

D. Doyle Mize agreed with Albert Range in May 1969 that Southdown would give Range a stock option of 25,000 shares should a merger between Southdown and Pearl be effectuated;

The agreement between Mize and Range was not adequately disclosed in the proxy statement, but this omission was not material;

The failure of the proxy statement to mention Aztec's offer or that Duff, Anderson & Clark had recommended the Aztec offer over Southdown's was not material;

The proxy statement did not fail to disclose adequately the power of the Pearl Board to waive the underwriting commitment;[5]

Because it eliminated the ten-day period after the merger date for the tender of 45 percent of the new Southdown preferred stock, the November 18, 1969, letter represented a material change in the merger plan;

By failing to inform Pearl shareholders that the December 2 date for tendering their stock was a change in the merger plan, the defendants omitted a material fact;

By failing to inform Pearl shareholders in the November 18 letter that the merger could be consummated without an underwriting commitment and without the ten-day period in which to tender their shares, the defendants omitted material facts; these failures were acts, practices, or courses of business which operated as a fraud or deceit upon the Pearl shareholders in connection with the merger;

By failing to inform Pearl shareholders in the November 18 letter that a corporation with a substantial interest in Southdown could be substituted for the underwriters, the defendants omitted a material fact; the failure to inform the Pearl shareholders that Zapata Norness, the party substituted for the underwriters, had a substantial ownership interest in Southdown

---

4. Smallwood does not allege violations of Section 14(d) or Rule 14d–1 on this appeal.

5. The jury also answered "Yes" to the following question: "Do you find from a preponderance of the evidence that Plaintiff Smallwood relied on any misrepresentation of material facts in the Pearl proxy statement or on the omission of any material facts, if any you have found, in making his decision to vote in favor of the Pearl-Southdown merger on September 9, 1969?" Because the jury did not find that the proxy statement omitted or misrepresented any material facts, this question, and its answer, are irrelevant.

was an act, practice, or course of business which operated as a fraud or deceit upon the Pearl shareholders in connection with the merger;

If the November 18 letter had not neglected to inform Pearl shareholders that the December 2 date for tendering their stock was a change in the merger plan, that the merger could be consummated without an underwriting commitment and without the ten-day period in which to tender their shares, and that a corporation with a substantial interest in Southdown could be substituted for the underwriters, a reasonable Pearl shareholder would have tendered his Pearl shares for $45 a share;

Between September 9 and December 30 Southdown and Pearl entered into a conspiracy to cause Pearl to be merged into Southdown on terms different from those in the merger agreement approved by the Pearl shareholders, but this conspiracy was not a proximate cause of the merger on December 30, 1969.

Upon receipt of the jury's responses to the special issues, the district court ruled that Smallwood should not recover individually, derivatively, or as representative of his class. Smallwood appeals.

## II.

### THRESHOLD QUESTIONS

First, we must examine whether Smallwood may properly raise before this Court his allegations of violations of Sections 10(b), 14(e), and 14(a) of the Securities Exchange Act of 1934 and Rules 10b–5, 14a–3(a), and 14a–9(a).

■■■■ A. *Rule 10b–5*—Rule 10b–5 has a specific and narrow task—to protect purchasers and sellers of securities from fraud perpetrated "in connection with the purchase or sale of any security".[6] In Birnbaum v. Newport Steel Corp., 2 Cir. 1952, 193 F.2d 461, cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356, the Second Circuit refused standing under the Rule to plaintiffs who were not alleged to be either purchasers or sellers of securities. This Court has consistently followed the *Birnbaum* rule.[7] See Hooper v. Mountain States Securities Corp., 5 Cir. 1960, 282 F.2d 195, 201, cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693; Rekant v. Desser, 5 Cir. 1970, 425 F.2d 872, 877; Herpich v. Wallace, 5 Cir. 1970, 430 F.2d 792, 806. We are persuaded, moreover, that, at least with respect to actions for damages,[8] *Birnbaum* maintains its vitality in most circuits. See, e. g., Iroquois Industries, Inc. v. Syracuse China Corp., 2 Cir. 1969, 417

6. 17 C.F.R. § 240.10b–5. Rule 10b–5 is promulgated under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j.

There is no question of a private right of action under Section 10(b) and Rule 10b–5. See, e. g., Herpich v. Wallace, 5 Cir. 1970, 430 F.2d 792, 803; Reed v. Riddle Airlines, 5 Cir. 1959, 266 F.2d 314.

7. We understand the issue of standing to be "whether [Smallwood] is an appropriate party to be seeking relief on account of defendants' illegal conduct". Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 2 Cir. 1973, 480 F.2d 341, 359 n. 11. See also Herpich v. Wallace, *supra*, 430 F.2d at 805.

8. Some courts have explicitly relaxed the *Birnbaum* requirement for actions seeking injunctive relief: "[W]e do not regard the fact that plaintiffs have not sold their stock as controlling on the claim for injunctive relief." Mutual Shares Corp. v. Genesco, Inc., 2 Cir. 1967, 384 F.2d 540, 546. See also Kahan v. Rosenstiel, 3 Cir. 1970, 424 F.2d 161, 173, cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290; General Time Corp. v. Talley Industries, Inc., 2 Cir. 1968, 403 F.2d 159, cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570; Ruckle v. Roto American Corp., 2 Cir. 1964, 339 F.2d 24. Mindful of Justice Marshall's warning that Rule 10b–5 questions "arise in an area where glib generalizations and unthinking abstractions are major occupational hazards", SEC v. National Securities, Inc., 1969, 393 U.S. 453, 465, 89 S.Ct. 564, 571, 21 L.Ed.2d 668, we express no comment as to the proper test for standing under Rule 10b–5 in this Circuit when injunctive relief is sought. Smallwood does not seek injunctive relief on this appeal.

F.2d 963, 968; Greenstein v. Paul, 2 Cir. 1968, 400 F.2d 580, 581; City National Bank v. Vanderboom, 8 Cir. 1970, 422 F.2d 221, 228, cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560. But see Eason v. General Motors, 7 Cir. Dec. 28, 1973, 490 F.2d 654.

Against the reflection of *Birnbaum* we must examine in this case two related transactions—the merger between Pearl and Southdown and the cash purchase of approximately 255,000 shares of new Southdown preferred stock by Zapata Norness. Smallwood's standing under Rule 10b–5 depends on whether in each of these transactions he (or in his derivative claim, Pearl) may be treated as a purchaser or seller of securities.

 The definitions of purchase and sale have sagged under the weight of courts' attempts to prevent ingenious minds from deflecting the statutory purposes of Section 10(b). The purpose of Section 10(b) is "to keep the channels of interstate commerce, the mail, and national securities exchanges pure from fraudulent schemes, tricks, devices, and all forms of manipulation", Hooper v. Mountain States Securities Corp, *supra,* 282 F.2d at 202, and "to outlaw the employment of manipulative or deceptive devices or contrivances, however novel or atypical", Herpich v. Wallace, *supra,* 430 F.2d at 806. See also S. E. C. v. Texas Gulf Sulphur Co., 2 Cir. 1968, 401 F.2d 833, 860 (en banc), cert. denied sub nom., Coates v. S. E. C. & S. E. C. v. Kline, 394 U.S. 976, 89 S.Ct. 1454, 22 L. Ed.2d 756; Kahan v. Rosenstiel, 3 Cir. 1970, 424 F.2d 161, 173, cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290. To prevent the *Birnbaum* doctrine from limiting too severely the ability of Rule 10b–5 to meet the broad purposes of the Act, "seller" has been stretched beyond its common law sense. See, e. g., Hooper v. Mountain States Securities Corp., *supra* (corporation issuing its own stock); Vine v. Beneficial Finance Co., 2 Cir. 1967, 374 F.2d 627, cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (short-form merger). For our present purposes, the most important extension of the Rule 10b–5 definitions is the treatment of a merger as a purchase or sale.

In S. E. C. v. National Securities, Inc., 1969, 393 U.S. 453, 467, 89 S.Ct. 564, 21 L.Ed.2d 668, the Supreme Court concluded that the shareholders of a merged corporation had "purchased" shares in the new corporation by exchanging their stock. As the Court pointed out, deception in a merger context has consequences not unlike those in a typical cash sale. The suit in the *National Securities* case was brought by the Securities Exchange Commission, and the Court cautioned that it was facing a question of statutory coverage, not standing. 393 U.S. at 467 n. 9. That distinction, however, has not proved potent. In Herpich v. Wallace, 5 Cir. 1970, 430 F.2d 792, shareholders of National American Life Insurance Company brought a derivative suit contending that, among other things, the defendants planned to defraud National American by causing it to acquire securities for an excessive price through a merger. This Court held that the Board of Director's resolution to merge was similar to a "partially consummated contract to buy or sell securities". 430 F.2d at 809.[9] Thus National American was treated as a purchaser-seller and was accorded standing under Rule 10b–5.[10]

9. See 15 U.S.C. § 78c(a)(13) & (14).

10. Other courts that have considered the status of mergers under Rule 10b–5 have reached a similar result. See Swanson v. American Consumer Industries, Inc., 7 Cir. 1969, 415 F.2d 1326, 1330; Mader v. Armel, 6 Cir. 1968, 402 F.2d 158, 161, cert. denied, 394 U.S. 930, 89 S.Ct. 1188, 22 L.Ed.2d 459; Dasho v. Susquehanna Corp., 7 Cir. 1967, 380 F.2d 262, 267, cert. denied, sub nom., Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470; Kohn v. American Metal Climax, Inc., E.D.Pa.1970, 322 F.Supp. 1331, 1358–1359 modified on other grounds, 3 Cir., 458 F.2d 255, cert. denied, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126.

■ On December 30, 1969, all Pearl shares were converted into shares of Southdown preferred under the merger agreement. Smallwood and the other members of his class, therefore, effectively "sold" their shares of Pearl and "purchased" shares of Southdown on that day.[11] We think that in both his individual and representative capacities, Smallwood, as purchaser and seller, has standing to assert violations of Rule 10b-5 in the merger transaction.

■ Whether Smallwood has derivative standing to question the merger is more difficult.[12] We have permitted share-

---

11. It is not clear whether Smallwood has exchanged his Pearl certificates for Southdown ones. In any event, all Pearl shares have in actuality been converted into Southdown shares. Indeed, the merger agreement stated that until surrendered the Pearl certificates "shall be deemed for all corporate purposes, other than the payment of dividends, to evidence ownership of the whole shares of Southdown Preferred Stock into which the same shall have been so changed and converted." Thus the shares of Pearl stock held by Smallwood and other members of his class have been "exchanged", regardless of the status of the certificates.

12. The appellees argue that Pearl lacks capacity to sue because Pearl has been merged with Southdown and has disappeared as a corporate entity. Capacity of a corporation to sue or be sued in federal court is determined by the law of the state in which it was organized. F.R.Civ.P. 17(b). Since Pearl was organized under the laws of Texas, Texas law controls. Neither Texas statutory nor case law speaks directly to the point, however, and we hesitate to ascribe a view to that state in the absence of some clear direction.

The problem is a sticky one. On the one hand, granting capacity may create an anomalous situation where a corporation sues itself for its own benefit. Bokat v. Getty Oil Co., Del.Sup.Ct.1970, 262 A.2d 246, 249. See also Vine v. Beneficial Finance Co., 2 Cir. 1967, 374 F.2d 627, 637, cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460. Yet mergers are not so irrevocable that the constituent corporations may not be separated by the courts, see Mills v. Electric Auto-Lite Co., 1970, 396 U.S. 375, 386, 90 S.Ct. 616, 24 L.Ed.2d 593, and denying the shareholders of a merged corporation the capacity to sue may also create an anomoly; the shareholders of the surviving corporation may bring a derivative suit, while the same relief is denied to the shareholders of the disappearing corporation. Compare the instant case with Dasho v. Susquehanna Corp., 7 Cir., 380 F.2d 262, 265-266, cert. denied sub nom., Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470. Moreover, refusing to permit a corporation to sue where, as here, the very legality of the merger is questioned and the defendants include the management of the disappearing and surviving corporations may work an inequitable result. Miller v. Steinbach, S.D. N.Y.1967, 268 F.Supp. 255. Sometimes, of course, relief may be adequately provided through the class action device. See Vine v. Beneficial Finance Co., supra 374 F.2d at 637; Basch v. Talley Industries, Inc., S.D.N.Y.1971, 53 F.R.D. 9, 12. But class actions may not be appropriate for certain kinds of corporate remedies, such as unwinding mergers.

The appellees in this case cite us to several federal cases in which merged corporations were not permitted to maintain claims. Vine v. Beneficial Finance Co., supra; Basch v. Talley Industries, Inc., supra; Heit v. Tenneco, Inc., D.Del.1970, 319 F. Supp. 884. In Vine, though troubled by the "meaninglessness" of the derivative claim, the Second Circuit denied the claim for another reason: it was unsuitable considering the relief desired. The Court felt that since the corporation had Class A and Class B shareholders, and the plaintiff sought recovery only for owners of Class A stock, he was better served by a class action. Both Basch and Heit were decided specifically under Delaware law and followed Delaware court decisions construing a Delaware statute, 8 Del.Code Ann. § 259. Furthermore, other federal cases have permitted minority shareholders to bring a derivative action on behalf of a corporation that no longer has an independent legal existence. See Jones v. Missouri-Edison Electric Co., 8 Cir. 1906, 144 F. 765, 776-777; Miller v. Steinbach, supra; cf. Ramsburg v. American Investment Co. of Illinois, 7 Cir. 1956, 231 F.2d 333, 336.

Texas has a statute not radically different from the Delaware statute that has been interpreted to deny capacity to a disappearing corporation in a merger. Compare Tex. Bus.Corp.Act art. 5.06 V.A.T.S. with 8 Del. Code Ann. § 259. This fact does not, however, make us any more eager to decide the question, which we feel should be left to the Texas courts. Because of our final disposition of this case, it is not necessary that we decide the capacity issue. We will assume derivative capacity without actually passing on the matter.

holders to sue derivatively when they cannot personally fit within the ambit of the "purchaser" or "seller" requirement of Rule 10b–5. See Herpich v. Wallace, *supra*, 430 F.2d at 803; Rekant v. Desser, 5 Cir. 1970, 425 F.2d 872. But in each case granting derivative standing under Rule 10b–5, the pleadings have alleged either that the corporation itself sold its stock at too low a price or purchased other stock at too high a price.[13] Here, Pearl did not itself have possession of the stock exchanged in the merger. The appellees argue that because there was no proof below that Pearl bought or sold any securities in connection with the merger Smallwood has no standing to sue derivatively. To accept the appellees' position, however, would be to rest the applicability of Rule 10b–5 on the form and not the substance of the transaction.

■■■ In interpreting the securities laws we must keep in mind the broad congressional purpose. Tcherepnin v. Knight, 1967, 389 U.S. 332, 336, 88 S. Ct. 548, 19 L.Ed.2d 564; Herpich v. Wallace, *supra*, 430 F.2d at 806. We must be careful that in deciding cases we contribute to the logical growth of regulation of the securities market and that we do not create simply another turn in an already complicated maze of regulation. The securities laws are intended to protect investors, not merely to test the ingenuity of sophisticated corporate counsel. See Crane Co. v. Westinghouse

Air Brake Co., 2 Cir. 1969, 419 F.2d 787, 798, cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50; A. T. Brod & Co. v. Perlow, 2 Cir. 1967, 375 F.2d 393, 397. That the exchange of stock was not made through the Pearl Brewing Company, as it presumably could have been,[14] cannot be deemed controlling.

■■■ The Securities and Exchange Act provides:

"The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire.

The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of."

15 U.S.C. § 78c(a)(13) & (14). Pearl and Southdown entered into a contract whereby on the effective date of the merger all of Pearl's assets were transferred to Southdown in return for Southdown preferred stock issued to Pearl's shareholders. Pearl was the contracting party and provided the consideration. In effect, Pearl bought the Southdown stock for its owners, the Pearl shareholders. Although not an active conduit or the ultimate recipient of the Southdown preferred stock, Pearl acted as a "purchaser" in all other respects. Little purpose would be served by hinging Smallwood's standing to sue derivatively under Rule 10b–5 entirely on the failure of Pearl to have physical possession of the shares, and we decline to do so.[15]

---

13. Wolf v. Frank, 5 Cir. 1973, 477 F.2d 467, cert. denied, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973) (allegation that corporation purchased securities for inadequate consideration); Bailes v. Colonial Press, Inc., 5 Cir. 1971, 444 F.2d 1241 (allegation that corporation issued securities for inadequate consideration); Shell v. Hensley, 5 Cir. 1970, 430 F.2d 819 (allegation that corporation purchased securities at inflated prices); Herpich v. Wallace, *supra* (allegation that corporation would be caused to purchase securities at disadvantageous terms); Rekant v. Desser, *supra* (allegation that corporation issued securities for inadequate consideration); Hooper v. Mountain States Securities Corp., 5 Cir. 1960, 282 F.2d 195, cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5

L.Ed.2d 693 (allegation that corporation issued securities for inadequate consideration).

14. See Fidelis Corp. v. Litton Industries, Inc., S.D.N.Y.1968, 293 F.Supp. 164, 169.

15. The appellees also contend that the derivative action must fail for want of a finding by the trial court that Smallwood adequately and fairly represents the interests of other Pearl shareholders. Rule 23.1, F.R.C.P., provides in pertinent part: "The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association." Although the district court is thus empowered to

In addition to alleging fraud in the approval and consummation of the merger, Smallwood asserts that fraud tainted Southdown's letter of November 18, 1969, to Pearl's shareholders and the purchase of the 255,000 shares of Pearl stock by Zapata Norness Corp. Under the *Birnbaum* doctrine, it is clear that in none of Smallwood's three actions—individual, class, or derivative— does he have standing, independent of the merger transaction, to attack the November 18 letter or Zapata's purchase. The federal courts have consistently denied Rule 10b–5 standing in damage actions to shareholders who allege that fraud induced them to retain their stock. See VI L. Loss, Securities Regulation 3620 (1969). We endorse this line of decisions and hold that one does not acquire standing under Rule 10b–5 by refusing to tender securities.

Nor does Smallwood gain standing that the letter and Zapata's purchase involved violations of the Rule by attempting to portray himself as a "forced seller" within the doctrine enunciated in Vine v. Beneficial Finance Co., 2 Cir. 1967, 374 F.2d 627, cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L. Ed.2d 460. Vine held shares of Class A common stock of Crown Finance Company, Inc. Although there were 624,870 shares of Class A stock, the 46,500 shares of Class B stock, owned principally by Crown's officers and directors, elected two-thirds of Crown's Board of Directors. Vine alleged a fraudulent scheme involving three steps: (1) Beneficial Finance Company purchased the Class B stock owned by the directors of Crown; (2) Beneficial made a cash tender offer to acquire 95 percent of Crown's total outstanding shares; (3) Crown was merged through a short-form merger with a wholly-owned subsidiary of Beneficial. Although Vine still held his Crown stock, that stock was itself worthless; he could realize value for his stock only by exchanging it with Beneficial for an amount fixed either by the terms of the merger or by appraisal. The Court held that Vine was a "seller" under Section 10(b) and Rule 10b–5. Requiring Vine to part with his shares before instituting suit would be a "needless formality".

Other decisions have followed the "forced seller" rationale of *Vine* to award standing to shareholders who retained their securities. In Crane Co. v. Westinghouse Air Brake Co., 2 Cir. 1969, 419 F.2d 787, cert. denied, 400 U. S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50, the rationale was extended to a corporation which, after its tender offer was defeated and the target corporation had merged with a third corporation, faced the threat of antitrust action if it did not part with its interests in the target company. And in Coffee v. Permian Corp., 5 Cir. 1970, 434 F.2d 383, this Circuit applied the "forced seller" rationale to a shareholder whose shares were converted into a claim for cash by an allegedly fraudulent corporate liquidation. See also Travis v. Anthes Imperial Limited, 8 Cir. 1973, 473 F.2d 515; Dudley v. Southeastern Factor & Finance Corp., 5 Cir. 1971, 446 F.2d 303, cert. denied, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101.

Of the "forced seller" cases, *Crane* seems the most far reaching; only in *Crane* did the plaintiff retain the realistic opportunity of selling or exchanging its stock in the open market. Even in *Crane*, however, the plaintiff had no practical alternative to disposing of its shares. Because of a change in corporate structure directly related to alleged fraud by the defendants, the plaintiff, though still holding the stock certificates, was deprived of a viable equity

---

dismiss a derivative action should it appear that the plaintiff does not adequately represent the shareholders in enforcing the rights of the corporation, a finding in the alternative is not required before a derivative action may go forward. See Bernstein v. Levenson, 4 Cir. 1971, 437 F.2d 756, 757. The burden is on the defendants to obtain a finding of inadequate representation, and no such finding was obtained here below.

interest in an existing corporation.[16] Judge Davis stated well the limits of the "forced seller" theory when he said: "*Vine's* informing principle, carried forward in *Crane*, is that a shareholder should be treated as a seller when the nature of his investment has been fundamentally changed from an interest in a going enterprise into a right solely to a payment of money for his shares." Dudley v. Southeastern Factor & Finance Corp., 446 F.2d at 307.

Smallwood's claim has not been so reduced. If he has not already done so, he may exchange his Pearl shares for shares of Southdown preferred, which he may then trade in the securities market. Or he may hold his interest in Southdown indefinitely. Although an interest in Southdown may not be what he desires, Smallwood can scarcely contend that Southdown is not a "going concern". Finally, the merger between Southdown and Pearl deprived Smallwood of none of the incidents of ownership of his stock. He retains his right to vote, to share in corporate earnings, and to share in the assets of Southdown in the event of dissolution. See Greater Iowa Corp. v. McLendon, 8 Cir. 1967, 378 F.2d 783, 796. We believe, therefore, that this situation is distinguishable from each of the "forced seller" cases.

■ That Smallwood does not have standing, independent of the merger transaction, to argue that Zapata's purchase and Southdown's letter of November 18, 1969, violated Rule 10b–5 does not lay to rest the possibility somehow of his asserting these claims. Indeed, we are of the opinion that Zapata's purchase was tied closely enough to the merger to be considered "in connection with" that transaction. Thus the standing that Smallwood acquired through the merger permits him to assert violations of Rule 105b–5 in the November 18 letter and the later purchase by Zapata. We base this view on the Supreme Court's decision in Superintendent of Insurance v. Bankers Life & Casualty Co., 1971, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed. 2d 128.

The facts of *Bankers Life* unfolded as follows. Manhattan Casualty Company was owned completely by Bankers Life. Two individuals, Standish Bourne and James Begole, negotiated with Bankers Life to buy Manhattan, and, eventually, Begole contracted with Bankers Life to make the purchase. To finance the purchase Bourne and Begole arranged a $5,000,000 loan from Irving Trust Company. Begole and Bourne then repaid the loan primarily by selling Manhattan's portfolio of government securities. Consequently, after the transactions Manhattan was $5,000,000 poorer, and Begole and Bourne had achieved ownership without expending any of their own money. To conceal the source of funds for their purchase of Manhattan, the new owners borrowed another $5,000,000 from Irving Trust and used this money to buy a certificate of deposit from Belgian American Trust for that amount payable to Manhattan. After another series of transactions designed to obfuscate further the true nature of the scheme, the same funds were used to pay off the second loan. At the conclusion of the charade, Manhattan's books showed only the sale of the government securities and the purchase of the certificate of deposit.

Facing this confusing set of transactions, the district court was unable to match any deception with a purchase or sale by Manhattan.[17] Although Manhattan was a seller of the government securities, there was no fraud in connection

---

16. We reject the dicta in a footnote in *Crane*, 419 F.2d at 798 n. 13, that stockholders whose alternatives after the merger are to exchange their shares for shares of the surviving corporation or to enforce their appraisal rights may be forced sellers under the *Vine* principle.

17. The Superintendent of Insurance, as liquidator of Manhattan, asserted Manhattan's rights. The question of standing was determined as if Manhattan itself was the plaintiff. Superintendent of Insurance v. Bankers Life & Casualty Co., S.D.N.Y.1969, 300 F.Supp. 1083, 1086 n. 1.

with that transaction. And Manhattan was not a purchaser of its own stock or of the certificates of deposit; in the former transaction Manhattan was never intended to take title, and the latter transaction was a wash. Superintendent of Insurance v. Bankers Life & Casualty Co., S.D.N.Y.1969, 300 F.Supp. 1083, 1098–1101. The court held that the acts must be independently unlawful; although "employment of fraud in connection with a security transaction" was unlawful, "the effectuation of a security transaction in connection with a fraudulent activity" was not. Id. at 1102. The Court of Appeals affirmed, 2 Cir. 1970, 430 F.2d 355, but the Supreme Court reversed.

The Supreme Court rejected the lower courts' preoccupation with whether the fraud was in the total scheme or in the purchase or sale. Writing for the Court, Justice Douglas declared: "Section 10(b) must be read flexibly, not technically and restrictively. Since there was a 'sale' of a security and since fraud was used 'in connection with' it, there is redress under § 10(b)". 404 U.S. at 12. The Court made clear that a direct or close relation between the fraud and the securities transaction was not required. "The crux of the present case", the Court found, "is that Manhattan suffered an injury as a result of deceptive practices touching its sale of securities as an investor." Id. at 12–13.

Thus the Supreme Court in *Bankers Life* permitted a purchase by the plaintiff in one transaction to create standing to allege a violation of Rule 10b–5 in a different transaction when both transactions were alleged to be part of a single fraudulent scheme. With allegations of such a scheme, it is sufficient under the *Bankers Life* test that the transaction involving a purchase "touch" the transaction alleged to involve the fraud. We do not hazard an opinion as to the

outer limits of this test.[18] It is important that the standard be fleshed out by a cautious case-by-case approach. It is clear to us, nonetheless, that the November 18 letter and the purchase by Zapata were tied to the merger transaction sufficiently tightly to pass the "touch" test of Bankers Life. See also Drachman v. Harvey, 2 Cir. 1972, 453 F.2d 736 (en banc) (reversing panel decision, 453 F. 2d 722, on authority of *Bankers Life*).

Pearl's directors testified that a large part of the attractiveness of the Southdown deal was that Pearl's shareholders would have a choice whether to accept cash or Southdown preferred stock as consideration for the merger. Furthermore, it is not at all clear that the merger agreement would have been approved by the shareholders without this provision. In essence, the sell-out provision provided an alternative to the statutory appraisal rights of the Pearl shareholder who harbored doubts about the value of the merger.[19] Rather than decline to vote for the merger and accept the appraised value of the stock as of the day before the vote, under the sell-out provision a shareholder could vote for the merger and retain the option to recover $45 for at least 45 percent of his shares should the merger look economically unattractive later. The sell-out provision offered the possibility of a shareholder's at least partially bailing out. There can be little doubt that it worked to sweeten significantly the merger deal.

B. *Section 14(e)*—In 1968, when Congress passed the Williams Act, amending the Securities Exchange Act, it created a new antifraud weapon. Congress provided in Section 14(e):

"It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of

18. One commentator has suggested that the "touch" test of *Bankers Life* could be interpreted to cover "everything involving corporate mismanagement". Note, The Controlling Influence Standard in Rule 10b–5 Corporate

Mismanagement Cases, 86 Harv.L.Rev. 1007, 1013.

19. Pearl shareholders had appraisal rights under Tex.Bus.Corp.Act, art. 5.12, V.A.T.S.

the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation."

15 U.S.C. § 78n(e). Were there ever any doubt from the unambiguous language the Congress intended the coverage of Section 14(e) to extend to *all* tender offers, that doubt has surely been dispelled by now. See Henry Heide, Inc., [1972–1973 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 78,838, at 81,836 (SEC Staff Letter, May 1, 1972). See also Butler Aviation International Inc. v. Comprehensive Designers, Inc., D.C., 307 F.Supp. 910, 914–915, aff'd, 2 Cir., 425 F.2d 842; 1 A. Bromberg, Securities Law: Fraud, § 6.3 (230); Note, The Developing Meaning of "Tender Offer" under the Securities Exchange Act of 1934, 86 Harv.L.Rev. 1250, 1259.

■■■■ To charge violations of Section 14(e) in federal court a private plaintiff need not be a purchaser or a seller of any securities, as he must be to sue under Rule 10b–5.[20] This is the primary contribution of the Williams Act to the antifraud arsenal; under Section 14(e) a plaintiff may gain standing if he has been injured by fraudulent activities of others perpetrated in connection with a tender offer, whether or not he has tendered his shares. See Electronic Specialty Co. v. International Controls Corp., 2 Cir. 1969, 409 F.2d 937, 946; Neuman v. Electronic Specialty Co., N.D.Ill.1969, [1969–1970 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 92,591. And a nontendering shareholder may complain derivatively of injury to the target company. See Fabrikant v. Jacobellis, E.D.N.Y.1970, [1969–1970 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 92,686.

■■■■ The remaining question in Smallwood's search for coverage under Section 14(e) concerns the meaning of "tender offer". Smallwood maintains that the November 18, 1969, letter from Southdown to Pearl's shareholders was a tender offer, or at least a "request or invitation for tenders", within the meaning of the Williams Act. The appellees argue that the letter is not covered by the statute. Although the appellees' arguments are not without some force, we hold that the November 18 letter was a tender offer and that Smallwood may allege violations of Section 14(e) in connection with it.

Neither Congress nor the Commission has provided a definition of the term "tender offer", and the commentators have not reached a concensus. There is general agreement that a tender offer involves a public invitation to a corporation's shareholders to purchase their stock for a specified consideration,[21] and there is some common recognition of

**20.** Section 14(e) does not explicitly provide for enforcement through private action. By analogy to J. I. Case Co. v. Borak, 1964, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423, however, courts have inferred a private right of action in that Section. See H. K. Porter Co. v. Nicholson File Co., 1 Cir. 1973, 482 F.2d 421, 424; Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 2 Cir. 1973, 480 F.2d 341, 361. Other decisions have assumed a private right of action under Section 14(e) without discussion. See, e. g., Electronic Specialty Co. v. International Controls Corp., 2 Cir. 1969, 409 F.2d 937; Susquehanna Corp. v. Pan American Sulphur Co., 5 Cir. 1970, 423 F.2d 1075. See also E. Aranow & H. Einhorn, Tender Offers for Corporate Control 287 (1973). We take this opportunity to make

explicit what has been implicit in this Circuit at least since 1970, see Susquehanna Corp. v. Pan American Sulphur Co., *supra*; a private right of action may be inferred from Section 14(e). Not only do we thereby follow the overwhelming weight of authority, but we reaffirm the importance of private litigation to the effective enforcement of the securities laws. See J. I. Case Co. v. Borak, *supra* 377 U.S. at 432; Chris-Craft Industries, Inc. v. Piper Aircraft Corp., *supra* 480 F.2d at 361; Herpich v. Wallace, 5 Cir. 1970, 430 F.2d 792, 804.

**21.** See E. Aranow & H. Einhorn, *supra* note 20, at 70; Note, The Developing Meaning of "Tender Offer" under the Securities Exchange Act of 1934, 86 Harv.L.Rev. 1250, 1251.

typical ingredients in transactions generally accepted to be tender offers.[22] But there is no clear agreement whether, as the appellees here maintain, a tender offer must be a "hostile bid *opposed* by incumbent management".[23]

The district court seemed to adopt the appellees' approach by holding Section 14(e) inapplicable because Southdown's November 18 letter to the Pearl shareholders was not a "takeover bid". There is some basis in the legislative history for this construction of the Act. In the early and mid-1960's the growth of the public bid to shareholders as a takeover device was alarming.[24] It is clear that the immediate purpose of the Williams Act was to protect investors from unscrupulous corporate raiders who could force shareholders into making a hasty, uninformed decision to sell by offering to buy a portion of the target corporation's securities at a premium price.[25] If the shareholder re-

22. In conventional tender offers the offeror typically offers to purchase all or a portion of a company's shares at a premium price, the offer to remain open for a limited time. Frequently, the obligation to purchase on the part of the offeror is conditioned on the aggregate number of shares tendered: if more than a certain number are tendered, the offeror need not purchase the excess; if less than a certain number are tendered, the offeror need not purchase any. The shareholder responding to the offer generally must relinquish control of the shares he desires to tender until the response of others is determined. H.R.Rep.No.1711, 90th Cong., 2d Sess, 1968 U.S.Code Cong. & Admin.News p. 2811; S.Rep.No.550, 90th Cong., 1st Sess. 2 (1967); Note, *supra* note 21, at 1251–1252. These ingredients of typical tender offers are not requirements. The SEC, for example, has stated its intent to extend the coverage of the Williams Act to special bids. SEC Securities Exchange Act of 1934 Release No. 8392 (Aug. 30, 1968). A special bid is a procedure whereby a purchaser makes a public offer to buy a specified number of shares at a fixed price, usually a premium. Shares are then purchased at that amount until the number of shares desired is obtained or until the bid is withdrawn. See Note, *supra* at 1261. While similar to the conventional tender offer, special bid purchases are not conditioned on the tendering of a certain number of shares, and, instead of relinquishing control of their shares for a period before sale, shareholders can sell their shares immediately upon tender. In Cattlemen's Investment Co. v. Fears, W.D. Okl.1972, 343 F.Supp. 1248, vacated per stipulation, Civil No. 72–152 W.D.Okl., May 8, 1972, the court treated a large-scale program of negotiated purchases as a tender offer under Section 14(e), despite the following facts: (1) no minimum number of shares was required to be tendered before the offeror would purchase, and the tendering shareholder, therefore, faced no period of relinquished control prior to actual sale;

(2) no maximum number of shares to be purchased was ever formally announced; and (3) no price was specified in advance. See Note, *supra*, at 1264–1265 n. 74.

Southdown's letter of November 18, 1969, contained more of the ingredients typically found in conventional tender offers than did either the purchase program in *Cattlemen's* or the offers to purchase which were the subject of the SEC release on special bids. Southdown's letter offered all Pearl shareholders a premium price of $45 a share for up to 45 percent of their stock for a total of 653,164 shares. Tendering shareholders were required to deposit their shares with exchange agents until the merger was consummated. And there was a risk that the shares would be returned unsold to the tendering shareholders. Of the typical ingredients mentioned above, the only one lacking was the condition that the offeror need not purchase any shares if a specified number of shares were not tendered.

23. Brief of Appellees 10. Compare E. Aranow & H. Einhorn, *supra* note 20, and Note, *supra* note 21, with Young, Judicial Enforcement of the Williams Amendments: the Need to Separate the Questions of Violation and Relief, 27 The Business Lawyer 391–92 (Jan. 1972).

24. E. Aranow & H. Einhorn, *supra* note 20, at 65 & n. 13. Cash tender offers involving companies listed on national securities exchanges rose from eight in 1960 to 107 in 1966. Id., citing 111 Cong.Rec. 24662–64 (Aug. 30, 1967). From 1959 to 1962 outsiders employed the tender offer as a takeover device only 29 times, compared with 41 proxy contests. But from 1963 to 1966 the tender offer was almost twice as popular as the proxy contest as a takeover tool. Note, *supra* note 21, at 1253 n. 16.

25. See Susquehanna Corp. v. Pan American Sulphur Co., 5 Cir. 1970, 423 F.2d 1075, 1085. "This provision would affirm the fact that persons engaged in making or opposing tender offers or otherwise seeking to influence the decision of investors or the outcome of

598

sponded quickly to the offer, he might not learn in time the true risks of his decision, but if he waited, he might lose his opportunity to gain a premium price for his securities because others had already tendered to the offeror the number of shares it required. See H.R.Rep. No.1711, 90th Cong., 2d Sess., 1968 U.S. Code Cong. & Admin.News, p. 2812.

That takeover bids formed the immediate catalyst to precipitate the Williams Act, however, does not require us to so restrict the definition of "tender offer". First, we consider that the failure of Congress and the SEC to define "tender offer" was not inadvertent. On the contrary, it appears that the full meaning of the term was intentionally left to be developed on a case-by-case basis. Neither Congress nor the Commission was reticent in defining the terms of the Williams Act when they chose to do so.[26] Second, we must interpret the securities laws so as to effectuate their broad remedial purposes. Tcherepnin v. Knight, 1967, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564; Herpich v. Wallace, 5 Cir. 1970, 430 F.2d 792, 802. As we have already stated, the Williams Act was intended primarily to aid investor decision-making. To that end, Congress recognized that protection from outsiders is not sufficient; Section 14(e) applies to statements by management of the target company, as well as by the tender offeror. See H.R.Rep.No.1711, 90th Cong., 2d Sess., 1968 Code Cong. & Admin.News, p. 2821. Moreover, if there is danger that an investor may be misled by management of the target company or the tender offeror in a situation where these two are hostile, there is no reason to assume that the danger will be lessened when both are on the same side of the fence.[27] Indeed, investors would seem to require greater protection in this situation. Cf. Electronic Specialty Co. v. International Controls Corp., 2 Cir. 1969, 409 F.2d 937, 946. Finally, in the Williams Act Congress itself seemed to envision friendly tender offers: Section 14(d)(8) exempts tender offers "by the issuer of such securities" from certain filing requirements. 15 U.S.C. § 78n(d)(8). We hold, therefore, that a bid to purchase securities is no less a "tender offer" within the meaning of Section 14(e) when it is unopposed by management of the target company than when it is opposed.

The appellees cite us to Dyer v. Eastern Trust & Banking Co., D.Me.1971, 336 F.Supp. 890. We do not quarrel with the substance of that holding. In Dyer Judge Gignoux refused to extend the coverage of Section 14(e) to a two-step corporate reorganization involving a merger and exchange of stock. The individual defendants had established Northeastern Bankshares Association, a bank holding company, which in turn had established Kenduskeag Banking Company, a "phantom bank" never intended to carry on banking business. Eastern merged with Kenduskeag, Eastern surviving. Then each Eastern shareholder who did not dissent exchanged his shares for shares of Northeastern. After the transactions were completed, Eastern was owned by Northeastern, and the past shareholders of the former owned the latter corporation. In

---

the tender offer are under an obligation to make full disclosure of material information to those with whom they deal."
H.R.Rep. no. 1711, 90th Cong., 2d Sess, 1968, U.S.Code Cong. & Admin.News p. 2821. See also Electronic Specialty Co. v. International Controls Corp., 2 Cir. 1969, 409 F.2d 937, 945.

26. See 15 U.S.C. § 78n(d)(2) & (3); 17 C.F.R. § 240.14a–1.

27. Citing Schoenbaum v. Firstbrook, 2 Cir. 1968, 405 F.2d 215, cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219, and Dasho v. Susquehanna Corp., 7 Cir. 1972, 461 F.2d 11, the appellees also contend that there can be no Section 14(e) or Rule 10b–5 liability in this case because the transactions were "arms-length". Those cases are inapposite. In both Schoenbaum and Dasho the controlling fact was that the transactions in question did not require shareholder approval. Neither case purports to speak to a situation where the plaintiff alleges fraud by the Board of Directors in transactions involving shareholder decision-making.

effect, the transactions did no more than interpose a bank holding company, Northeastern, between Eastern and its shareholders. There was no real change in ownership and control. As the court found, no more was involved than "a change in corporate structure". 336 F. Supp. at 909.

The lesson we read in *Dyer* is not that there may not be a friendly tender offer. Rather, it is that a corporation does not become a tender offeror simply by proposing a paper exchange of securities. There must be contemplated some change of control. If actual control does not shift, it is difficult to see why the shareholder needs the protection of Section 14(e). He has what he had before, in reality if not in form. He has made no significant investment decision for which information and reflection are essential. He has not been "forced to take a chance". H.R.Rep.No. 1711, 90th Cong., 2d Sess, 1968 U.S.Code Cong. & Admin.News p. 2812. In contrast to the situation in *Dyer*, Southdown's letter of November 18, 1969, required Pearl's shareholders to make an important and irrevocable investment decision—to sell or not to sell for $45 each the shares of Southdown preferred due them upon consummation of the merger.

The appellees make a final argument against the applicability of Section 14(e) by attempting to separate the offer from the purchase of the securities tendered pursuant to the November 18 letter. The argument appears to run like this: A "tender offer" under the Williams Act must include an offer *to purchase* securities. Neither Southdown nor Pearl was "purchasing" securities, and, although Zapata made the ultimate purchase, it did not make a "tender offer for, or request or invitation for tenders of, any class of equity security";

Zapata was not considered as a potential purchaser on November 18. We know of no requirement in Section 14(e), however, that the person or company inviting the tenders makes the ultimate purchase. Furthermore, we cannot believe that Congress contemplated that the statute could be so easily circumvented. Whether the tender offeror purchases the securities or simply invites a tender for another is of no account to the investor for whose protection Section 14(e) was enacted. A "tender" offer within the meaning of the Williams Act may be made by those acting in concert with others as well as those acting alone.[28]

### III.

### LIABILITY

A. *Pearl's letter of July 17, 1969—*
Turning to the question whether Smallwood actually proved at trial that the defendants violated the securities laws, chronologically the first contested action we encounter is Pearl's letter of July 17, 1969.

Executive Vice President Range mailed a press release and cover letter to Pearl shareholders on July 17 advising them that the Boards of Directors of Pearl and Southdown had approved a merger agreement between the two companies and describing some of its more significant provisions. The correspondence was not accompanied by a proxy statement. Smallwood maintains that the letter violated Rule 14a–3(a) of the Securities Exchange Act of 1934, 17 C. F.R. § 240.14a–3(a), which prohibits soliciting proxies without furnishing a written proxy statement.

Rule 14a–1(f) broadly defines "solicit" and "solicitation" to include:

"(i) Any request for a proxy whether or not accompanied by or included in a form of proxy;

---

28. Smallwood also alleges violations of Section 14(a) of the Securities Exchange Act and Rules 14a–3(a) and 14a–9(a) thereunder. The appellees do not argue that Smallwood may not sue under Section 14(a), and indeed there is no question. See, e. g., Greater Iowa Corp. v. McLendon, 8 Cir. 1967, 378 F.2d 783; Studebaker Corp. v. Gittlin, 2 Cir. 1966, 360 F.2d 692; Dann v. Studebaker-Packard Corp., 6 Cir. 1961, 288 F.2d 201.

(ii) Any request to execute or not to execute, or to revoke, a proxy; or

(iii) The furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy."

17 C.F.R. 240.14a–1(f).

■■■ Pearl's July 17 correspondence was not a "request for a proxy" or a "request to execute or not to execute, or to revoke, a proxy" under Rule 14a–1(f). Proxies were not mentioned in either the letter or the press release. Moreover, a date for the stockholders meeting at which the merger would be voted on had not been established and was in any event apparently contingent upon the approval of the merger by Southdown's shareholders. We recognize, however, that even a communication well in advance of any formal request for a proxy may be made "under circumstances reasonably calculated to result in the procurement, withholding, or revocation of a proxy" and thus may be considered a "solicitation" within the Proxy Rules. Furthermore, a letter not itself requesting proxies may be subject to the Proxy Rules as "part of a continuous plan ending in solicitation . . . which prepare[s] the way for its success". S. E. C. v. Okin, 2 Cir. 1943, 132 F.2d 784, 786.

There are sound reasons for limiting the ability of interested parties to color the issue prior to the disclosure of complete information as required in a proxy statement. Without some restrictions, seeds of argument could be planted so deeply and securely prior to the time of formal proxy solicitation as to resist effectively later uprooting. As Judge Learned Hand stated in *Okin*: "We have no doubt that the power [of the SEC to regulate] extends to such writings; were it not so, an easy way would be open to circumvent the statute; one need only spread the misinformation adequately before beginning to solicit, and the Commission would be powerless to protect shareholders. The earlier stages in the execution of such a continuous purpose must be subject to regulation, if the purpose of Congress is to be fully carried out." 132 F.2d at 786.

■■■ There are, however, countervailing considerations. It seems clear that we cannot always expect both prompt and complete disclosure of material corporate developments. The information required in a proxy statement is extensive, see Schedule 14A, 17 C.F.R. § 240.14a–101, and care is needed in its preparation.[29] And there is some value to encouraging prompt disclosure. Prompt disclosure helps to ensure not only that all investors, insiders and outsiders, have at all times equal access to market information, see S. E. C. v. Texas Gulf Sulphur Co., 2 Cir. 1968, 401 F.2d 833 (en banc), cert. denied sub nom., Coates v. S. E. C. & S. E. C. v. Kline, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756, but also that investors are provided a continuing opportunity to make "knowing, intelligent decisions", Herpich v. Wallace, 5 Cir. 1970, 430 F.2d 792, 806; Kahan v. Rosenstiel, 3 Cir. 1970, 424 F.2d 161, 173, cert. denied 398 U. S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290.

29. Furthermore, gathering the information required in a proxy statement is likely to be so expensive that even the most primitive cost/benefit analysis would militate against requiring that all corporate announcements with a possibility of affecting some future proxy solicitation be accompanied or preceded by the information contained in a proxy statement. "Free and open disclosure" holds a clarion ring, but we must remember that freely flowing information is not an end in itself; it is the means by which we reaffirm our belief that informed shareholders, making decisions they consider to be in their own best interests, will in the aggregate guide the economy along the optimum route. With too little information shareholders cannot effectively translate their desires into corporate decision-making, but requiring the gathering and dissemination of too much information will hang as a heavy weight around the neck of the securities market. Cf. Dooley, The Effects of Civil Liability on Investment Banking and the New Issues Market, 58 Va.L.Rev. 776, 835.

We do not believe that Congress intended to sacrifice utterly the speed of disclosure to ensure its completeness. Thus we seek not to discourage the expeditious reporting of significant developments which may affect the price of a corporation's stock. While we cannot overlook the capacity of such a communication to affect later shareholder voting, it is reasonable to conclude that statements describing an event that has just occurred should be examined under a less powerful glass than similar statements made after a period sufficient for careful study and reflection has passed.

It is important also to know whether, when the questionable statement is made, proxies have been requested or the time for soliciting proxies is near. In general, the further removed the statement is from an act of shareholder suffrage, the less likely it is that the statement will leave its imprint upon that shareholder action. See Brown v. Chicago Rock Island & Pacific RR. Co., 7 Cir. 1964, 328 F.2d 122, 125.

■ We hold that, taking into consideration these factors, the July 17 letter was not "reasonably calculated to result in the procurement . . . of a proxy". The correspondence was sent within a week of the agreement to merge. No proxies were mentioned in the communication, and as of July 17 no stockholders meeting had been called and no proxies had been requested. See Brown v. Chicago Rock Island & Pacific RR. Co., *supra* at 125. Compare Union Pacific RR. Co. v. Chicago Northwest Ry. Co., N.D.Ill.1964, 226 F.Supp. 400. Moreover, the correspondence, if not totally innocuous, was not overwhelmingly prejudicial either. The press release merely stated that a merger proposal had been approved and detailed some of the provisions. The cover letter stated that the Boards of Pearl and Southdown believed the merger "to be in the best interest of the shareholders of both companies" and that the Boards recommended that the merger be approved. To say that the directors approved the merger agreement because they thought the merger to be in the shareholders' interest is to say only that the directors did their fiduciary duty. And one would only expect that having themselves approved the agreement they would recommend that the shareholders approve it in turn. In these circumstances we conclude that the correspondence did not violate Rule 14a–3(a).

■ B. *The Proxy Materials of August 12, 1969*—The jury findings failed to substantiate Smallwood's complaint that the proxy materials of August 12, 1969, violated any of the federal securities laws. Smallwood contends on appeal that, as a matter of law, the proxy statement violated Rule 14a–9(a) of the Securities Exchange Act of 1934, 17 C.F.R. § 240.14a–9(a), which prohibits misleading statements and omissions in proxy materials. He argues that the August 12 communication contains omissions of material facts, in that Pearl's power to waive Southdown's obligation to obtain an underwriting commitment was inadequately disclosed, and Albert Range's stock option was not disclosed at all.

■ 1. *Disclosure of the Waiver Power*—The merger agreement conditioned Pearl's obligation to consummate the merger on the fulfillment "(or waiver by Pearl in writing)" of Southdown's obligation to procure a firm commitment from a group of underwriters to purchase for a period of ten days following the merger up to 45 percent of the shares of Southdown preferred stock for $45 a share from those shareholders who desired to sell. The merger agreement was attached as Appendix II to the proxy statement of August 12. Although Southdown's obligation to arrange for a firm commitment underwriting was mentioned three other times in the materials sent to the Pearl shareholders on August 12, the waiver power was mentioned only in the merger agreement. Nevertheless, the proxy materials, in the first sentence of the first page and several other times, referred the reader to the merger agreement.

The jury found that the waiver power was adequately disclosed.[30]

There is no dispute that both by position in the proxy materials and by weight of repetition Southdown's obligation to obtain an underwriting commitment gained prominence over the power to waive that provision. And the general references to the merger agreement did not completely counter-balance this effect. Nevertheless, we consider that the balance was not tipped so sharply as to require that we override the jury's finding.

■ We have already stated that the information required in a proxy statement is extensive. Difficult decisions must be made as to what information to place toward the beginning and what to place further toward the end of proxy statements, what to emphasize and what to state more blandly. It is, of course, impossible to emphasize everything, and every fact cannot be contained in the beginning. DiJulio v. Digicon, Inc., D. Md.1972, 339 F.Supp. 1284, 1290. We require those who draw up proxy statements to be fair and sensitive to the needs of shareholders in exercising their rights of corporate suffrage. But we do not require that the writers of proxy statements be clairvoyant. A fact essential for a shareholder decision today may become irrelevant tomorrow, and vice versa. It is enough that proxy statements be complete and not misleading in light of the circumstances existent and reasonably anticipated at the time distributed.[31] See Rule 14a–5, 17 C.F.R.

---

30. Special Issue No. 9 read as follows:

"Do you find from a preponderance of the evidence that Pearl's August 12, 1969 proxy statement failed to adequately disclose that the Board of Directors of Pearl had the power to waive the condition of Pearl's obligation to consummate the merger by obtaining a firm commitment from a group of underwriters to purchase up to 45% of the Southdown preferred stock as a price of $45 per share for a period of 10 days following the effective date of the merger?"

The jury answered "No."

On February 2, 1972, one of Smallwood's attorneys submitted an affidavit to the district court to the effect that, after the jury's verdict was returned, he received a telephone call from a Mr. Brooks, one of the jurors, and that during their conversation Mr. Brooks indicated that the jury had intended to convey its opinion that the waiver power had *not* been adequately disclosed. Meeting with counsel for the plaintiff and defendants, at the behest of plaintiff's attorneys the court forbade counsel for both sides to talk with any of the jurors. On the plaintiff's motion, the court reimpaneled the jury on February 15, 1972. After reading Special Issue No. 9 to the jury, the court asked, "Did the jury unanimously vote to answer that issue 'No' ?" Polled individually, each juror told the court that he voted to answer the issue "No". The court then overruled Smallwood's motion to correct the verdict and reinstructed Smallwood's counsel not to speak to the jury.

But the matter was not yet concluded: On March 23, 1972, Smallwood filed a motion for leave to obtain juror affidavits. Two of his attorneys stated by affidavit that on leaving the courtroom on February 15, 1972, several of the jurors had approached them, stating that they had conferred and were in agreement that the jury verdict was that the waiver power was *not* adequately disclosed. The motion for leave to obtain juror's affidavits was denied.

Smallwood contends that the jury was confused by the double-negative aspect of Special Issue No. 9 caused by the presence of the word "failed". Special Issue No. 9, however, was virtually identical to the special issue Smallwood had requested. It would seem contrary to any concept of judicial economy to provide him a second bite of the apple when any responsibility for confusing the jury must fall at his own door. Cf. Safeway Stores, Inc. v. Dial, 5 Cir. 1963, 311 F.2d 595. In any event, we find that taking jurors' affidavits in this instance would violate the well-established principle that jurors may not impeach their verdict. See McDonald v. Pless, 1915, 238 U.S. 264, 267–268, 35 S.Ct. 783, 59 L.Ed. 1300; Complete Auto Transit, Inc. v. Wayne Broyles Engineering Corp., 5 Cir. 1965, 351 F.2d 478, 480. Whether or not the jury misunderstood the charge of the court is not a question to be reexamined after the verdict has been rendered. United States v. Chereton, 6 Cir. 1962, 309 F.2d 197.

31. In Gerstle v. Gamble-Skogmo, Inc., 2 Cir. 1973, 478 F.2d 1281, 1300–1301, the Court held that scienter is not an element of proof under Rule 14a–9 in a case where the plaintiffs "represent the very class who were asked to approve a merger on the basis of a misleading proxy statement". We need not broach the issue; the standard outlined here is implicit even if negligence is taken as the test of culpability.

§ 240.14a–5; Miller v. Steinbach, S.D. N.Y.1967, 268 F.Supp. 255, 276.

Smallwood failed to produce any evidence at trial that as of August 12, 1969, the defendants anticipated, or should have anticipated, that Southdown would be unable to obtain an underwriting commitment pursuant to the merger agreement. The uncontradicted testimony was that Pearl's attorney, Guenther, sought and received confirmation from Lehman Brothers · before the merger agreement was signed that such a firm commitment was possible. Moreover, Lehman Brothers was prepared, at least into November 1969, to go through with the underwriting. We find that there was ample evidence for the jury to find that considering the totality of circumstances the waiver power was adequately disclosed.

The doctrines of "buried facts" and "similar emphasis" do not compel a different result. See Swanson v. American Consumer Industries, Inc., 7 Cir. 1969, 415 F.2d 1326, 1330; Mills v. Electric Auto-Lite Co., 7 Cir. 1968, 403 F.2d 429, 433–434, vacated on other grounds, 1970, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593; Gould v. American Hawaiian Steamship Co., D.Del.1971, 331 F.Supp. 981, 995; Kohn v. American Metal Climax, Inc., D.D.Pa.1970, 322 F.Supp. 1331, 1362, modified on other grounds, 3 Cir. 1971, 458 F.2d 255, 265, cert. denied, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126; Beatty v. Bright, S.D. Iowa, 1970, 318 F.Supp. 169, 174; Norte & Co. v. Huffines, S.D.N.Y.1968, 304 F. Supp. 1096, 1110, aff'd in part, remanded in part, on other grounds, 2 Cir. 1969, 416 F.2d 1189, cert. denied, 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396. In each of these cases the facts held to be inadequately disclosed—predominantly concerning conflicts of interest—were apparent at the time the proxy materials were mailed, and it should have been obvious at that time that burying the facts, or giving them less than significant emphasis, would deprive the shareholders of "full and honest disclosure", Greater Iowa Corp. v. McLendon, 8 Cir. 1967, 378 F.2d 783, 795.

██ We base our holding on the lack of evidence that anyone should reasonably have anticipated that the waiver provision would be material to the shareholder's decision to approve or disapprove the merger. We do not fear, therefore, that we are traversing a slippery slope where "management can come to the shareholders for approval of an offer that has certain irresistable features, obtain approval largely on the basis of those features, and then eliminate them by use of the blank check or waiver power the shareholders have given them.[32]" The position and emphasis given in a proxy statement to waiver powers invoked for any cause reasonably to be anticipated at the time a proxy statement is distributed deserves close judicial scrutiny.

2. *Materiality of Range's Stock Option*—The jury found that during the merger negotiations in the Spring of 1969 D. Doyle Mize, Chairman of the Board of Southdown, agreed that Southdown would give Albert Range a qualified stock option to purchase 25,000 shares of Southdown common stock should the merger between Southdown and Pearl be consummated. The proxy statement did not mention the promise of such an option. The jury found that the failure to disclose the stock option was *not* an omission of a material fact.

██ Smallwood argues first that in its charge to the jury the district court defined "material" erroneously. The court's test of materiality was "whether a reasonably prudent person *would* attach importance to the information in determining his course of action". (Emphasis supplied.) Smallwood contends that the proper definition of "material" is whether a reasonable shareholder *might* consider the information important in determining how to vote.

A recent decision of this Circuit endorsed a definition almost identical to

---

32. Brief of Appellant 44.

the one used by the trial court in this instance. In John R. Lewis, Inc. v. Newman, 5 Cir. 1971, 446 F.2d 800, 804, this Court held that the test of materiality is "whether a reasonable man would attach importance to the fact misrepresented in determining his course of action". This definition, born of the Restatement of Torts, § 538(2)(a), has a rich history of application to the securities laws. See, e. g., Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 2 Cir. 1973, 480 F.2d 341, 363; Rogen v. Ilikon Corp., 1 Cir. 1966, 361 F.2d 260, 266; List v. Fashion Park, Inc., 2 Cir. 1965, 340 F.2d 457, 462, cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60. It has not been and should not be discarded as a standard. See ALI, Federal Securities Code § 256 (Tent. Draft No. 2, March 1973).

The appellant points out that the phraseology used by the Supreme Court in Mills v. Electric Auto-Lite Co., 1970, 396 U.S. 375, 384, 90 S.Ct. 616, 24 L. Ed.2d 593, and Affiliated Ute Citizens v. United States, 1972, 406 U.S. 128, 153–154, 92 S.Ct. 1456, 31 L.Ed.2d 741, was whether a fact *might* have been considered important by a reasonable investor. We are not convinced, however, that the Court intended to replace the traditional standard with a more relaxed one. There is no evidence of any desire by the Court to relax the standard of materiality to a mere possibility of influence upon a reasonable investor, a standard implied by the word "might". On the contrary, the Court in *Mills* emphasized that the test of materiality required "a significant *propensity* to affect the voting process", 396 U.S. at 384 (emphasis original). Moreover, the word "might" does not seem to have been carefully considered by the Court. See the thorough discussion by Judge Friendly on this point in Gerstle v. Gamble-Skogmo, Inc., 2 Cir. 1973, 478 F.2d 1281, 1301–1302. No issue of materiality was presented on appeal in *Mills*, and Justice Harlan was not seeking to describe a standard when he said: "Where the misstatement or omission in a proxy

statement has been shown to be 'material,' as it was found to be here, that determination itself indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote." 396 U.S. at 384. Rather, he was characterizing "the minimum that all would agree was 'embodied' in the district court's conclusion that the defect was material". Gerstle v. Gamble-Skogmo, Inc., *supra* 478 F.2d at 1301. And as support for the statement Justice Harlan cited the standard of the Restatement. The Court in *Ute* adopted the word "might" without comment.

 Smallwood also charges that the district court erred by not finding the stock option material as a matter of law. But the stock option appears not "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality". Johns Hopkins University v. Hutton, 4 Cir. 1970, 422 F.2d 1124, 1129. Certainly, it is essential that the recipients of a proxy statement know that a director's recommendation contained therein is not completely disinterested. See Mills v. Electric Auto-Lite Co., 7 Cir. 1968, 403 F.2d 429, vacated on other grounds, 1970, 396 U.S. 375, 90 S.Ct. 616, 24 L. Ed.2d 593; Swanson v. American Consumer Industries, Inc., 7 Cir. 1969, 415 F.2d 1326. But the proxy materials of August 12, 1969, made it clear that Range would have some personal gain from the consummation of the merger. The materials indicated that Range was to become a director of Southdown, that he was to be employed under a written contract for $75,000 annually, and that Southdown had a qualified stock option plan. Although the Pearl shareholders were not advised of the full extent of the merger's possible value to Range, they were "sufficiently alerted" to Range's interests "to be on their guard". Mills v. Electric Auto-Lite Co., *supra*, 403 F.2d at 434. We do not imply that the stock option was not of sufficient im-

portance to support a jury finding of materiality. Clearly, it was. We hold only that the question of the materiality of the option was within the legitimate province of the jury.

C. *The letter of November 18, 1969*—On November 18, 1969, Southdown sent to Pearl's shareholders a cover letter with attachments to instruct the shareholders in the procedures necessary for them to sell their Southdown preferred stock to underwriters for $45 a share. The letter assumed that a firm commitment underwriting would be accomplished and that all other conditions to the merger would be met. To sell their Southdown preferred to the underwriters, the letter instructed, Pearl's shareholders must tender their certificates of Pearl stock, with the appropriate deposit form, to appointed exchange agents by 3:30 P.M. on December 2, 1969. Nowhere did the November 18 materials contain mention of the waiver power, and the instructions precluded any possibility that Pearl's shareholders would be permitted to tender their shares of Southdown preferred to underwriters under the merger agreement for ten days following the consummation of the merger.

The jury found that the November 18 letter omitted the following material facts: (1) that the December 2 deadline for tendering shares was a change from the terms of the merger agreement, (2) that the merger could be consummated without an underwriting agreement and without a ten-day period after the merger in which to tender shares, (3) and that a corporation with a substantial investment in Southdown could be substituted for the underwriters. The jury also found that the first two of these omissions, together with the failure to inform the Pearl shareholders that Zapata had a substantial ownership interest in Southdown, were "act[s], practice[s], or course[s] of business which operated as a fraud or deceit upon the Pearl shareholders in connection with the Pearl-Southdown merger". Smallwood maintains that the trial court

erred by not ruling that the defendants violated Section 14(e) and Rule 10b–5. We disagree.

■■■ We are in accord with the Second Circuit that the same elements must be proved to establish a violation of either the Section or the Rule. Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 2 Cir. 1973, 480 F.2d 341, 362. Congress adopted in Section 14(e) the substantive language of the second paragraph of Rule 10b–5 and in so doing accepted the precedential baggage those words have carried over the years. See Electronic Specialty Co. v. International Controls Corp., 2 Cir. 1969, 409 F.2d 937, 945. Once standing is established, therefore, the analysis under Section 14(e) and Rule 10b–5 is identical. Thus we consider together Smallwood's contentions that the November 18 letter violated Section 14(e) and Rule 10b–5.

■■■ Before discussing why we affirm the district court's holding that Smallwood has not established a right of recovery concerning the November 18 letter, it is important to put to rest one of the appellees' arguments on which we do not rely; that is, that the disclosure in the proxy materials of the power of the Pearl Board to waive the underwriting commitment immunized a lack of similar disclosure in the November 18 letter. We cannot accept the premise that prior disclosure in one communication will automatically excuse omissions in another. As we indicated above, the adequacy of disclosure is a function of position, emphasis, and the reasonable anticipation that certain future events will occur. Perception of future events may take on a different cast as the future approaches, and, what is more important, later correspondence may act to bury facts previously disclosed. A balance once struck will not ensure a balance in the future. As new communications add a dash of recommendation, a pinch of promise, and a dusting of repetition, the scale may be tipped. To prevent an injustice to the shareholders, the elements must be weighed each time that the shareholders are requested (or

encouraged) to make a new decision. See Chris-Craft Industries, Inc. v. Piper Aircraft Corp., *supra* 480 F.2d at 365 n. 18.

We do not imply that previously disclosed facts may not be considered in the balance. Nor do we imply that a material fact must be disclosed in each communication or be repeated before each shareholder decision in order to avoid a violation of the securities laws. Facts may be adequately disclosed by emphasis or repetition in previous correspondence by the same parties or through outside sources. In Johnson v. Wiggs, 5 Cir. 1971, 443 F.2d 803, for example, this Court held that information reported in the newspapers and on television and readily available in any brokerage house was sufficiently "in the public domain"; the defendant did not need to disclose "that which had been publicly proclaimed in several ways on several occasions". Id. at 806. Nevertheless, we emphasize that the adequacy of disclosure can be measured only by considering the total mix.

 It is not clear whether in its findings concerning the November 18 correspondence the jury considered, as it should have, the disclosure of the waiver power in the August 12 proxy materials. But we need not attempt to interpret the findings or remand for clarification. For even if we assume that the jury found that, taking into account all of the correspondence, the November 18 letter contained omissions of material facts, Smallwood failed to establish that the defendants acted with any culpability.

 Some culpability has consistently been required as an element of proof in this Circuit in cases alleging violations of Rule 10b–5. See, e. g., Herpich v. Wallace, 5 Cir. 1970, 430 F.2d 792, 804; Clement A. Evans & Co. v. McAlpine, 5 Cir. 1970, 434 F.2d 100, 103, cert. denied, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153. And we reiterate that

the elements to be proved to establish a violation of Section 14(e) are identical to those under the Rule. There is no question of requiring plaintiffs to prove scienter in its strict common law sense —that the defendants made statements they either knew to be false or knew they had no basis for believing were true. See Derry v. Peel, House of Lords 1889, 14 App.Cas. 337, 374. The trend in the federal courts has been toward a more relaxed test. See, e. g., Stevens v. Vowell, 10 Cir. 1965, 343 F.2d 374, 379 (common law fraud not required); S. E. C. v. Texas Gulf Sulphur Co., 2 Cir. 1968, 401 F.2d 833, 854 (en banc), cert. denied sub nom., Coates v. S. E. C. & S. E. C. v. Kline, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (specific intent to defraud not required); City National Bank v. Vanderboom, 8 Cir. 1970, 422 F.2d 221, 229, cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (knowledge of impression made not required); Kohler v. Kohler Co., 7 Cir. 1963, 319 F.2d 634, 637 (knowledge of falsity and bad faith intent to mislead not required). Some Courts have gone so far as to state, or hint, that they were abandoning the fraud requirement under Rule 10b–5.[33] Nevertheless, liability in a private action for damages has apparently never been imposed for negligent conduct under the Rule. See Bucklo, Scienter and Rule 10b–5, 67 Nw.U.L. Rev. 562. With scienter requirements in a state of flux in the Courts of Appeals, we do not view this as the proper occasion to draw the bottom line on the degree of scienter required in this Circuit. Suffice it to say that some culpability, beyond mere negligence, is required.

 Smallwood did not demand a special issue on the culpability of the defendants, and no such issue was submitted to the jury. Under Rule 49(a), F. R.Civ.P., the issue is deemed found in accord with the judgment for the defendants below. General Insurance Co. of America v. Fleeger, 5 Cir. 1968, 389

---

33. See, e. g., Ellis v. Carter, 9 Cir. 1961, 291 F.2d 270; Kohler v. Kohler Co., 7 Cir. 1963, 319 F.2d 634; Myzel v. Fields, 8 Cir. 1967, 386 F.2d 718, cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143; Stevens v. Vowell, 10 Cir. 1965, 343 F.2d 374.

F.2d 159, 162–163; L'Urbaine Et La Seine v. Rodriguez, 5 Cir. 1959, 268 F.2d 1, 4.

We conclude that the evidence does not compel us to override this implied finding of insufficient proof of culpability. On November 18 all parties expected an underwriting to take place. And there was reason to be sanguine. Lehman Brothers had repeatedly advised Pearl's attorneys and Southdown that an underwriting was feasible, and serious discussion with Lehman Brothers continued into December. Moreover, it was not until after November 18 that Southdown common stock began a steep decline. There was of course a possibility, recognized at least by Albert Range, that the price of Southdown common would sink to the point where an underwriting could not be obtained. But we do not view the evidence as establishing that this possibility loomed so large that the failure to indicate in the November 18 letter the potential consequences should an underwriting not take place was, as a matter of law, more than negligence. Nor is culpability proved by the failure to disclose that the December 2 deadline for tendering shares was a change in the terms of the merger agreement or that the merger could be consummated without a ten-day period afterwards in which shares could be tendered. The evidence does not establish that the defendants knew that these provisions "changed" the merger agreement. Indeed, the testimony indicated that it was never intended that the Pearl shareholders have ten days after the merger to tender their shares.

D. *Exercise of the Waiver Power and Consummation of the Merger*— Smallwood contends that Pearl fraudulently waived the underwriting commitment and thereafter fraudulently consummated the merger. Although he concedes that such a power of waiver may be granted to a board of directors, he insists: (1) that the power was fraudulently exercised in this instance and that, because the merger could not be lawfully consummated without a firm commitment underwriting or its proper waiver, the merger itself was illegal; (2) that the power to waive the underwriting did not include the power to substitute Zapata Norness, a party with an adverse interest, for the underwriters; and (3) that Pearl never exercised a waiver of the right promised the Pearl shareholders to tender their stock within ten days following the merger.

■ We find no merit in these contentions. As we have already stated, the waiver power was adequately disclosed in the proxy materials distributed on August 12, 1969. In voting for the merger, therefore, the Pearl shareholders gave the power to waive the underwriting commitment to the Board of Directors. There is no evidence that in exercising the waiver power the Board used anything other than sound business judgment. The possibility of an underwriting, still strong in mid November, had disintegrated. The bottom threatened to drop out of the price of Pearl stock which had risen significantly, against the current of a downward flowing market, in anticipation of the planned merger with Southdown. If the merger had been cancelled, the jury found, Pearl stock would have carried a value of $21.80 a share, $16 less than the stock was actually worth after the merger was effectuated.

■ As to Smallwood's second contention, we fail to see any logic in the bizarre insistence that even if Pearl could waive the underwriting commitment, it could not substitute another purchaser for the underwriters. The concept of waiver is not so restricted. By waiving the underwriting commitment, Pearl permitted the merger to be consummated, and thereby protected the value of Pearl stock by $16. By obtaining another purchaser for the tendered stock at $45 a share, Pearl saved the benefit of their decision to those shareholders who made the election to sell. Furthermore, there is no evidence that Zapata's purchase injured those who, for whatever reason, retained their shares. Once it became impossible to obtain un-

derwriters to purchase the tendered stock at $45 a share, Pearl was not legally obligated to obtain another purchaser. Pearl could have simply waived the commitment, returned the tendered shares, and consummated the merger. Instead, Pearl honored what it apparently felt was a moral commitment to the shareholders who had tendered their shares pursuant to the sell-out provision of the merger agreement. We do not find fault with Pearl for this.

Smallwood's argument that Pearl did not exercise a written waiver of the alleged right of shareholders to tender their stock within ten days after the merger is likewise without substance. Pearl had, in fact, never promised that its shareholders would have ten days following the merger to tender their shares. The evidence at trial indicated that it was never intended that Pearl shareholders should have such a right, and, indeed, that such a right would be inconsistent with underwriters' requirements that they know in advance of an underwriting how many shares are to be included. Because Pearl never actually promised this right, Pearl did not, of course, have to formally waive it.

## IV.

### CONCLUSION

Because of our holdings in this case we need not consider questions of reliance, causation, and the appropriate measure of damages. Nor must we dive into the murky waters of Smallwood's contentions that the district court erred in defining the plaintiff's class and in refusing to grant the plaintiff's motion to invalidate requests by former Pearl directors and other shareholders to be excluded from the class. We have considered Smallwood's other contentions, and we find them to be without merit.

Far from reflecting a "clear, persistent, and almost defiant disregard of the securities laws and the rights of Pearl's stockholders",[34] the record in this case shows a corporation, caught in a downward-moving securities market, attempting to salvage what it could for its shareholders of a deal made in anticipation of less gloomy days. The district court adjudged the defendants not liable for any losses incurred by Smallwood, his corporation, or his class.

This judgment is

Affirmed.

---

34. Reply brief of Appellant 22-23.